## STATE v. VINES

(No. 1887; February 11, 1936; 54 Pac. (2d) 826)

214

For the defendant and appellant there was a brief by *James T. McGuckin,* of Sundance, and *E. C. Ray-*

*mond,* of Newcastle, and oral argument by *Messrs. Raymond* and *McGuckin.*

216

For the plaintiff and respondent there was a brief

by *Ray E. Lee*, Attorney General; *Thomas F. Shea*, Deputy Attorney General; *William C. Snow*, Assistant Attorney General, all of Cheyenne; *R. E. McNally*, of Sheridan; *Otis Reynolds* and *Rodney M. Guthrie*, of Sundance, and oral argument by *Messrs. Shea, McNally, Reynolds* and *Guthrie*.

*E. C. Raymond* and *J. T. McGurkin* in reply.

KIMBALL, Chief Justice.

James Vines appeals from a judgment by which he is sentenced to death on an unqualified verdict finding him guilty of the murder of Louis J. Schiller at Hulett, Crook County, on September 14, 1933.

The appellant, on November 25, 1933, filed a plea in abatement from which the following facts appear. He was arrested without a warrant on October 7, and thereafter, on October 10, was charged with the crime by complaint filed with a justice of the peace. A warrant on the complaint was served on appellant, but he was never taken before the justice, no preliminary examination was had, and the proceeding before the justice was dismissed on October 30. An information was then, on October 31, filed in the district court. October 2 was the first day of a regular term of that court. The plea alleges that the court "was not in session at the time the said information was filed in that there was not a jury in attendance and was not in session at the time the said information was served upon this defendant. That this defendant is not and was not a fugitive from justice and never at any time waived a preliminary examination." The prayer was that the information be abated, and defendant granted

a preliminary examination. To this plea the state filed a demurrer which the court sustained. The ruling is assigned as error.

Counsel for the state contend, among other things, that the material facts alleged in the plea were matters "apparent upon the face of the record," (R. S. 33-504) and that the ruling of the trial court was justified on the ground that appellant should have filed a motion to quash instead of a plea in abatement. Whatever merit there may be in this contention, we should not feel justified in resting our decision on such a technical ground in a case where the appellant has been sentenced to death. The plea may be treated as a motion to quash, if that be necessary to a consideration of the question on its merits.

It is clear from our decisions that a preliminary examination is not necessary except when required by statute. State v. Sureties of Krohne, 4 Wyo. 347, 34 Pac. 3; Ackerman v. State, 7 Wyo. 504, 54 Pac. 228; State v. Tobin, 31 Wyo. 355, 368, 226 Pac. 681. The controlling statute is section 33-408, R. S. 1931, which reads as follows:

"No information shall be filed against any person, for any felony until such person shall have had a preliminary examination therefor, as provided by law, before a justice of the peace or other examining magistrate or officer, and shall have been held for trial by such court or officer, unless such person shall have waived his right to such examination; provided, however, that the information may be filed without such examination against fugitives from justice; and provided, also, that whenever an offense shall be charged against any person, at any time within thirty days immediately preceding the first day of a regular term of court of the county wherein such offense is charged to have been committed, or within thirty days immediately following the first day of such regular term of court, provided such court shall continue in session for such period, then and in either of such cases, informa-

tion may be filed without such examination; but in cases last named, the accused shall have the right to a trial at such term of court; provided, that if the defendant shall not be tried at such term of the district court, for the reason that the case is continued upon the application of the prosecution, the defendant shall be entitled to an immediate examination before a committing magistrate."

The information was filed "within thirty days immediately following the first day" of the regular October term of court, and the only question is whether, under the statute, the appellant was entitled to a preliminary examination because such term (or court) did not "continue in session for such period." Appellant contends that the state's demurrer to the plea in abatement admitted that the court was not in session at the time the information was filed. The allegation that the court was not in session was qualified by the clause "in that there was not a jury in attendance," and we think it was the allegation, thus qualified, that was admitted by the demurrer. The proviso in question, as it appears in the session laws (Laws 1895, ch. 123, § 7) is that "such term shall continue in session for such period." In subsequent compilations of the statutes the word "term" is changed to "court." There can be no doubt that a term or a court may continue in session without the presence of a jury. Without a jury it may not be able to try felony cases, but the right to file the information in the district court during the thirty-day period without preliminary examination is not made to depend on the ability of the court to try the case during that period. The statute provides that the defendant shall have the right to a trial during such term, and if he is not then tried for the reason that the case is continued upon the application of the prosecution, he shall be entitled to a preliminary examination. In this case the October term continued

not only for 30 days, but until April, 1934, when, with a jury in attendance, the appellant was tried.

From appellant's discussion of the plea in abatement it seems that his main purpose in asking for a preliminary examination was to obtain knowledge of the facts the state expected to prove at the trial. He was really seeking a disclosure of the state's evidence in order that he might prepare his defense. It is clear that under our statute a preliminary examination is not for that purpose. If it were, there would be no reason for omitting it in those cases in which the information is filed within 30 days of the beginning of the term. There seems to be no rule of the common law or statute that gives a defendant the right before trial to pry into the state's case by obtaining a disclosure of its evidence, though there is authority for the view that the trial court has at least a discretionary power to permit the defendant to inspect documents or chattels for the purpose of obtaining information that will enable him to make a defense. See, People ex rel. Lemon v. Supreme Court, 245 N. Y. 24, 156 N. E. 84, 52 A. L. R. 200, and note, 52, A. L. R. 200, and note, 52 A. L. R. 207. Appellant, in a reply brief, says he cared nothing "for the theory of the prosecution or the manner in which they expected to prove it," but insists that he was entitled to know "what the charge would be." Explanation of this statement shows that appellant claims to have been hampered in his defense by not knowing whether it would be claimed that he actually and with his own hand committed the murder or that he was an accessory before the fact. The statute provides that an accessory before the fact may be informed against, tried and convicted in the same manner as if he were a principal. R. S. § 32-1101. The information in the present case was in the form provided by section 33-417, and has not been challenged in any way. It charges appellant and several others with first

degree murder. It is true appellant could not from the information tell whether the state at the trial would claim that he was a principal or that he was an accessory. We are cited to no decisions holding that he was entitled to that information before the trial. He admits that he at least knew that the state might rely on evidence showing either that he was a principal or that he was an accessory. If the state had charged him as principal in one count and as accessory in another, the situation would have been practically the same, and the state could not have been required to elect upon which count it would proceed to trial. 31 C. J. 778-779. Besides, from a public confession of Richard Reel, some time before the trial, appellant did have some knowledge of what the state would claim in regard to his participation in the crime.

The statute provides that a defendant in a criminal action "may make an affidavit stating that he believes he cannot receive a fair trial owing to the . . . excitement or prejudice against him in the county." The prosecuting attorney may by his affidavit traverse the allegations of defendant's affidavit, and the issue so presented is tried by the court or judge. At the hearing "witnesses may be examined orally or by affidavits," and if it appears that the trial of the case "would be more impartial in another county, the application shall be granted." R. S. 1931, § 89-1106.

It is contended that the court erred in refusing to grant a change of venue applied for under this section. Also, that it erred in refusing to receive in evidence fifty-one affidavits offered by defendant in support of the application. These rejected affidavits are alike except for the names of the affiants. Each affiant swears that he is a resident of the county; "that there is a wide-spread feeling of prejudice" in the county against the defendant; that the feeling of prejudice is such that defendant cannot have a fair trial in Crook

County, and that he "can have a more impartial trial in another county in the state." After the court had sustained the state's objection to the introduction of these affidavits, counsel for appellant stated that he did not think appellant was entitled to a change on the proof admitted. In the circumstances, the only questions we need to consider are whether the affidavits should have been admitted, and whether, if admitted, they should have changed the result. It seems to be the general rule that affidavits stating the conclusions of the affiants, with no facts to support the conclusions, have little or no weight. See People v. Bodine, 7 Hill, 147; Frank v. Avery, 21 Wis. 166; Ex Parte Curtis, 3 Minn. 274; Territory v. Manton, 8 Mont. 95, 19 Pac. 387; State v. Knadler, 40 Kan. 359, 19 Pac. 923. We have found no case in which such affidavits were excluded from the evidence. Of course, affidavits of opinions or conclusions, alone relied on, furnish no basis for granting a change of venue, but apparently the practice is to receive them in evidence, probably on the theory that the court may conclude from other evidence that there is basis in fact for the opinions expressed in the affidavits. In the case at bar we do not think there was any other evidence from which the trial court should have found that there were facts to justify the conclusions stated in the affidavits. The affidavits, therefore, if admitted in evidence, should not have changed the result. We do not think the evidence on the hearing of the application shows that the trial court erred in refusing to grant the change. The record does not show that there was any difficulty in obtaining a jury. See Alexander v. State, 20 Wyo. 241, 256, 123 Pac. 68. The murder of a respected, peaceable, unarmed old man in his home excited the interest and indignation of the people of the county, and no doubt there was a feeling that the perpetrators of the crime should not escape punishment. These are the

natural results of shocking crimes (Alexander v. State, supra, at p. 258), and do not of themselves require a change of venue. But it seems proper at this point to say that from the whole record it may be that appellant is justified in contending that the jury, in rendering a verdict that carries the death penalty on evidence which, to say the least, is unsatisfactory, may have been unconsciously influenced by public prejudice which appellant in applying for a change of venue was unable to prove.

Schiller, the murdered man, owned and operated a flour mill at Hulett. He lived alone in a small room attached to the southwest corner of the mill. While in this room, near midnight September 14, 1933, he was brutally assaulted and killed by Richard Reel in the perpetration of a robbery.

Richard Reel, Frank Reel, Loyde Wilkerson, Ion Smith, Arthur James, appellant and Blanche Vines, were arrested. Richard and Frank Reel are brothers, and Loyde Wilkerson is their sister's husband. The appellant and Blanche Vines were living together as husband and wife. Richard Reel confessed the crime, and he and his brother testified for the state at the separate trial of the appellant. "Reel," when thus mentioned, will mean Richard Reel.

It was the theory of the state that the robbery was planned by Richard Reel and appellant, and that the latter was present and received a part of the loot at the scene of the crime. This theory was supported by the testimony of Reel, and by some evidence which the state contends is corroborative. As the jury has returned a verdict which carries the irretrievable penalty, we have carefully examined the testimony, and shall set forth those parts that seem to have a bearing on appellant's alleged connection with the crime.

Richard Reel's testimony is substantially as follows:

He and appellant and Blanche Vines had been intimate associates for several years. At times they lived in the same house and the men worked for the same employer. Reel was in love with Blanche, and was afraid of appellant. Reel did not claim that Blanche returned his love, but she treated him as a close friend. He states that the robbery of Schiller was first mentioned in the fall of 1930 in a conversation between appellant, Blanche and Reel at Osage, Wyoming. Schiller was a man of some wealth, and it was supposed that he kept money or valuable securities somewhere about the mill. Reel had lived for years at Hulett, knew Schiller very well, and was thoroughly familiar with the mill. When in the conversation at Osage, Reel stated that he wouldn't be "bothered any more" if he had Schiller's money, appellant suggested they go to Hulett for the purpose of spying on Schiller to learn where he kept his money. They acted on this suggestion, and that night, Reel and appellant looked through a window at the mill and saw Schiller with a black box before him looking at some papers. They were not certain that the box contained the valuables they were looking for, and the thought of robbery was put aside for the time. In a day or two, Reel and Vines were arrested for stealing alfalfa seed, and Reel, pleading guilty, was sent to the penitentiary. While he was in the penitentiary he and Blanche Vines corresponded regularly, and in November, 1932, partly through the efforts of appellant and Blanche, Reel was paroled. While he was on parole, he claims that appellant several times mentioned the robbery, saying they would look into it when Reel's parole expired. The parole expired in April, 1933, and from then until July 30, Reel claims that appellant and he frequently talked of the robbery. Appellant suggested how it could be done. Two plans were mentioned on July 29 or 30. The first, in the language of the witness, was: "One of us stay hid out

of the sight of Schiller and the other go inside and make a purchase of some kind and flash a large bill on him, and when he turned to get the change, to knock him cold, and the one hiding would come up then." The other suggested plan was "to go to the mill with your face covered and have on a large pair of shoes, or a small pair of tennis shoes, and stick a gun in his stomach and tell him to hand it over." No plan was then decided on. It was still thought that they must first find out where Schiller kept his money, and for that purpose, Reel, on August 2, went to Hulett to spy again on Schiller. Reel was in or near Hulett for some time, but did not go near the mill, and made no effort to spy on Schiller. He did not see appellant again until August 26 at appellant's apartment in Gillette. It was then that Reel says the final plans for the robbery were made. Asked, as a witness, to give a complete statement of the conversation at that time, he testified that appellant "made the suggestion that the 13th or 14th would be the night to do this job, and the plans of how it was going to be done was that he was to arrive at Hulett some time between 10 an 11 o'clock and I was to arrive at Hulett from camp between 11 and 12 o'clock, and Jackie (Blanche Vines) asked at that time if she could go along, and he said she could go with him, and then we went to the feed barn, Jim (appellant) and I." The 14th of September was definitely agreed upon as the date. At the feed barn, appellant asked Reel what he had found out while at Hulett, and Reel answered that he had found out nothing. Reel, while on the witness stand, was again asked to tell all the conversations on that day, and replied that he did not recall any more. After August 26, Reel and appellant did not meet or communicate with each other until the night of the murder, 19 days later. From about September 1 until after the murder on the 14th, Reel worked at a logging camp near Custer,

South Dakota, 150 miles from Hulett and about 130 miles from Gillette. Working with Reel at the logging camp were his brother Frank and his brother-in-law Loyde Wilkerson. About September 7, Richard Reel told Wilkerson of the plan to rob, and on the 14th he told Frank Reel that they wanted to go to Hulett on business, and Frank said he would take them in his car. The two Reels and Wilkerson left the camp after dark on the night of the murder in the car which contained a piece of iron, the weapon used in the murder. They traveled by way of Newcastle and Moorcroft to Hulett where they arrived between 11 and 12 o'clock. Before crossing the bridge entering Hulett the lights of the car were turned off, and the car then driven to the southeast corner of the Schiller mill. Richard and Wilkerson got out and Frank stayed in the car. Richard testified that when he got out of the car he could see another car parked on the south side of the river about a quarter of a mile from the mill. The river is the Belle Fourche which runs along the south side of the mill. He could not recognize the car but knew it must be appellant's because it had been planned that appellant and Blanche would be there. Reel did not wait for appellant to appear at the mill, but went with Wilkerson along the south side of the mill to a place where Wilkerson stopped to act as a look-out. Richard, alone, then went to the southwest corner of the mill and looked through a window into Schiller's living room where he could see Schiller seated at a table looking through some papers. Reel then entered the room, and without a word being spoken struck Schiller over the head with the piece of iron held in a sack. Schiller fell to the floor. Reel searched the room finding sixty dollars, some in a cupboard and some in Schiller's pocket. A closed tin box was on the table. During the search Schiller made a noise, and Reel hit him again. One of the blows cut through the skull and into the

brain. Reel then called Wilkerson, and the two "cleaned up" the blood and "straightened up" the room. Reel then, telling Wilkerson to continue the "cleaning up," and that he (Reel) was going to the basement, picked up the tin box, and went out of the room. As he left the room, he saw the appellant standing below a three-foot bank, called the first bank of the river, 15 or 20 feet south of the door to the room where the murder was committed. Reel had not seen appellant since August 26, but expected him to be there because "it was planned that night," and he had seen the automobile on the other side of the river. The box, which Reel had not looked into, was handed to appellant. All of the conversation that then took place is told by Reel as follows: "He just merely asked me, 'how did you make out?' and I said, 'all right, I guess; I got the box.'" "He said, 'are you sure you got the right box?' and I said, 'I think so.'" Appellant looked in the box, which by starlight (there being no other light) appeared to be full of papers. Appellant turned a few of the papers over and said "that was the right box." Nothing was said about the money, which Reel kept. Reel asked appellant who was with him, and appellant replied that his wife was with him. After this conversation appellant, carrying the box, started back toward the river and toward the car on the other side. The water in the river was rather low and its edge was some 100 feet from the bank where appellant was standing when he took the box from Reel. Reel for a time watched appellant as he walked toward the water's edge, and then returned to the room and assisted Wilkerson in continuing to mop up the blood. They moved the body of the dead man so as to hide it under the bed, blew out the light, and then returned to their car and drove back to the logging camp where they arrived about 4 o'clock the following morning. Reel did not see appellant again until September 29

when appellant, in company with defendants Smith and James, came to the camp where Reel was working. Reel testified that appellant then called him aside and told him that it was not safe to dispose of the bonds at that time, but when it was safe, the two men (Smith and James) could dispose of them, and that as soon as they were disposed of, Reel would get his share.

The foregoing recital contains the substance of the testimony of Richard Reel in regard to the planning and commission of the crime and appellant's connection therewith. The state contends that Reel's testimony is corroborated by the following facts and circumstances:

First, by the admitted intimate friendship and association of appellant, Blanche and Reel. The admitted intimacy between these parties ended in July, 1933, when, according to the testimony of appellant and Blanche, Reel was asked to leave them because he was becoming too demonstrative in his affections for Blanche. There was no evidence, except Reel's, to show that he and appellant were together near the scene of the crime, and it is conceded that they did not see or communicate with each other for 19 days before and 15 days after the murder.

Second, it is contended the testimony of Richard is corroborated by the testimony of his brother Frank, who stated that he drove the car to Hulett without knowing the intentions of his companions, and that he did not know what they had done until they told him during the return to the logging camp. He stayed in his car all the time it was parked at the mill. He testified that while he was sitting in the car, at the southeast corner of the mill, about 10 minutes after his brother and Wilkerson had left the car, he saw a man come up from the river toward the mill, and in "just a short while" saw the man go back, "and it looked like

he was carrying something when he went back that he didn't have when he came over." There is nothing in the testimony of this witness to indicate that the man he saw bore any resemblance to the appellant. Besides, Frank himself was probably an accomplice, defined in the court's instructions as one who "could have been indicted for the offense, either as principal or as accessory before the fact." If both Richard and Frank were accomplices, they could not overcome the suspicion that attaches to their testimony by attempting to corroborate each other. See Wigmore on Evidence (2d ed.) § 2059.

Third, the state insists that the testimony of Reel is corroborated by the admitted fact that appellant in company with James and Smith visited Reel at the logging camp on September 29, and that Reel and appellant then had a private conversation. Appellant admitted the visit and a private conversation with Reel at that time, but claimed that he came there to try to collect $48 owed him by Reel, and to see about the sale of liquors by Smith and James, who were bootleggers. There was no corroboration of Reel's testimony that he and appellant then talked about the disposition of the stolen bonds by Smith and James. It may be stated here that there was no evidence tracing the stolen bonds into the hands of appellant, Smith or James; and recalled that the plan of the crime, as related by Reel, did not include the participation of Smith or James.

We come now to the only testimony, aside from that of Reel, that tends to connect appellant with the robbery and murder. The public knew nothing of the murder until Schiller's dead body was found about 4 o'clock in the afternoon of September 15. Bernice Norman, a negro girl, who at that time was employed as a maid by Mr. and Mrs. Charles Williams, testified that

appellant, at about 7 o'clock on the morning of the 15th, came to the Williams apartment in Gillette for a milk bucket, and in the presence of herself and Mr. and Mrs. Williams asked Mr. Williams if he knew Schiller, and then said "someone knocked him on the head last night, and took his strong box." Evidently the quoted remark does not show all that was said about the crime. The witness states that she heard all the conversation "about the killing and the murder." Appellant reported not only that Schiller had been knocked on the head and robbed, but that he had been murdered. Appellant's report of the crime, if made some nine hours before the dead body had been found, as claimed by the witness Norman, was highly incriminating; but if made on the morning of the 16th, after news of the crime reached Gillette, was of no importance. Appellant and Mr. and Mrs. Williams each testified that the conversation substantially as related by Miss Norman did take place in the Williams apartment, but they claim that it was on the morning of the 16th. Mr. and Mrs. Williams were contradicted by proof that on November 3 they signed affidavits stating that the conversation was on the morning of the 15th. They testified that when they signed the affidavits they were not certain about the date. At the trial they were positive that the conversation was on the morning of the day when, at a later hour, they heard the murder discussed on the streets of Gillette. There was a good deal of testimony as to what was said by these parties when they signed the affidavits. Mr. Williams was apparently depending largely on his wife's recollection as to the date, and the county and prosecuting attorney, who was present when the affidavits were procured, testified that Mrs. Williams then stated "that the same day that he (appellant) mentioned it (the murder), later in that same day, she heard it discussed on the street." That appellant was

talking about the crime on the morning of the 15th, as testified to by the state's witness, is improbable and does not seem to fit with the other evidence in proof of the state's case. Appellant is pictured as the shrewd planner, the master mind, and not as a person who would be so foolish as to tell of the crime before it became known to the public. The testimony of the state does not show a planned murder, but only a planned robbery. It is lacking in details of the plan as to how the robbery would be done. It does not show that appellant, when he left the mill with the black box, had any knowledge of what had been done in the room, except what he might infer from the fact that Reel had obtained the box. If Richard and Frank Reel told the whole truth as to what happened at the mill, we are left to wonder how appellant, at seven o'clock the next morning, knew that Schiller had been knocked on the head and killed.

We have set forth the substance of all the evidence which the state claims is corroborative of the testimony of Reel. We think it appears that the verdict is based on the testimony of that witness without any satisfactory independent evidence tending to connect appellant with the crime. We have no statute, and there is no rule of the common law, that forbids a conviction on the uncorroborated testimony of an accomplice, but by a rule of practice it is the duty of the court to advise the jury not to convict upon such testimony. State v. Alderilla, 37 Wyo. 478, 263 Pac. 616, and cases cited. The reason for the rule is the supposed promise or hope of conditional immunity. This supposition is clearly justified in the case at bar. The confessed murder of an unarmed old man was wanton and inexcusable even from the viewpoint of a burglar and robber. The murderer must have realized that he richly deserved hanging, and that his only hope was that he might give some consideration for a lesser

penalty. As in most other cases, a promise of immunity was denied. The hope, however, must have existed, and we are informed that the witness has been sentenced to life imprisonment. The evidence of the relations between this witness and appellant and Blanche Vines is ground for the inference that fear, hate and jealously were other motives for giving false testimony.

The character and motives of this witness are not the only reasons for doubting his testimony implicating the appellant. His story of appellant's participation in the planning and execution of the crime is in many respects incomplete and inherently improbable. It was appellant's opinion that they must first find out where Schiller kept his money, and there is no explanation showing why the robbery was undertaken before that information was obtained. Reel's testimony does not show that appellant's plan of the robbery included participation by anyone except Reel, appellant and Blanche, yet Reel calls his brother and brother-in-law to his aid. The final plan is made on August 26, to be carried out on September 14, by two parties who lived at Gillette and were to be at the scene between 10 and 11, and another who lived in South Dakota and was to be there between 11 and 12, with no understanding as to how or when they would get together, or what part each was to perform. When Reel gets to the mill, he supposes appellant is there because he sees a car across the river a quarter of a mile away. He does not look about the mill to make sure that appellant is there, but proceeds to commit the murder and robbery, and then finds that appellant has crossed the river and is waiting to receive the loot. They engage in a conversation in which appellant does not ask, and Reel does not tell, how the robbery has been carried out. There is no further communication between the parties until 15 days later when appellant with James and Smith, not previously mentioned in the plans,

comes to Custer to talk with Reel about the sale of the stolen bonds.

The credibility of Reel is also affected by his admission on cross-examination that after he was arrested he made at least three false statements in writing in regard to appellant's connection with the murder. His first statement was that appellant and Smith were with him on the trip from the logging camp to Hulett. His second statement was that appellant and Wilkerson accompanied him on the trip. As to his third statement, he testified that it named Wilkerson as his companion; he could not remember whether it mentioned his brother, and he didn't believe it mentioned appellant. It was not until the fourth statement that the story of appellant's participation in the crime was told as it was repeated at the trial. When asked on redirect to explain why he made the false statements he answered: "I didn't want to bring my brother into it, and tried to defend Loyde Wilkerson in the first statement, and because I was afraid of this bunch—James Vines and the bunch concerned."

The appellant and Blanche Vines denied all the testimony of Richard Reel that had a tendency to implicate them in the planning or execution of the crime. They testified that until after 10 o'clock on the night of September 14, they in company with Mrs. Williams attended a picture show at Gillette, and then, after spending a short time at the Williams apartment, went to bed for the rest of the night. Their testimony that they attended the show was corroborated by Mrs. Williams and the proprietor of the show. There was also testimony that on the night of the murder appellant's automobile was in a repair shop and not in running condition.

The appellant stands convicted and under a sentence of death on a verdict based on the testimony of an accomplice, discredited by almost every means known

to the law, and corroborated only by the doubtful and contradicted evidence of the witness Norman. The duty of the appellate court in passing on the sufficiency of the evidence in such a case is not easy to determine. We frequently announce that a jury's finding on the facts, approved by the trial judge's refusal to set the verdict aside, will not be disturbed on appeal if there is any substantial evidence to support the finding. See State v. Wenger, 47 Wyo. 401, 410, 38 P. (2d) 339. In spite of the recognized danger of acting on the uncorroborated testimony of an accomplice, we have no doubt that such testimony may constitute what we call "substantial evidence." See State v. Alderilla, supra. In at least one case we have said that there must be "substantial credible evidence" to support the verdict. Jones v. State, 26 Wyo. 293, 299, 183 Pac. 745. In that case a defendant charged with larceny was convicted on the testimony of a witness who it was claimed was an accomplice. Because the witness was of bad character, and his improbable story was contradicted on material matters, it was held that his evidence was neither substantial nor credible, and the verdict was set aside. The decision in that case would seem to be authority for a similar disposition of the case at bar. In many other cases from jurisdictions where there are no statutes requiring corroboration of an accomplice, verdicts of guilty based on the testimony of accomplices have been set aside on similar grounds. See Edwards v. State, 2 Wash. 291, 26 Pac. 258; State v. Armijo, (on rehearing) 35 N. Mex. 533, 540, 2 P. (2d) 1079; Campbell v. People, 159 Ill. 9, 42 N. E. 127; People v. Alward, 354 Ill. 357, 188 N. E. 425; White v. State, 146 Miss. 815, 112 So. 27; Rutledge v. State, 171 Miss. 311, 157 So. 907; Sykes v. United States, 204 Fed. 909; Jahnke v. State, (on rehearing) 68 Neb. 181, 104 N. W. 154. These cases recognize the principle that a verdict cannot be set aside by an ap-

# 238

pellate court on the mere ground that the jury believed the uncorroborated testimony of an accomplice, but hold that where there are other facts and circumstances, such as an improbable story or self contradiction, to discredit the accomplice's testimony, the appellate court is not bound to hold that it constitutes substantial evidence. In England, under the Criminal Appeal Act of 1907, a conviction based on the uncorroborated evidence of an accomplice will be quashed if the Court of Criminal Appeal, considering all the circumstances of the case, thinks the verdict unreasonable, or that it cannot be supported having regard to the evidence. Rex v. Baskerville, (1916) 2 K. B. 658, 664.

We realize that the state in the prosecution of crime must often rely on the testimony of accomplices, and that in those cases, as in others, an appellate court should refrain from substituting its judgment for that of the jury on the facts. Horn v. State, 12 Wyo. 80, 120, 73 Pac. 705. It is not necessary to decide that the judgment in the present case should be reversed on the sole ground that the jury should not have believed Reel's testimony that appellant participated in the crime. But the evidence implicating the appellant was so doubtful that we cannot but fear that the jury may have been unduly influenced by the feeling that the appellant was shown by the evidence to be the kind of a person likely to have taken part in the crime. Appellant admitted that when he was 24 years old he pleaded guilty to the charge of breaking into a railroad box car, and served a sentence of a year in the penitentiary. He also admitted that he was arrested with Reel in 1930 for stealing alfalfa seed; that he had associated with bootleggers; that there had been no marriage ceremony between him and his wife, and that on two occasions he and his wife and Reel had slept in the same bed, he between the others. We assume that proof of these acts and associations by

appellant's admissions was proper, but it was not admissible for the purpose of showing that appellant probably committed the offense for which he was being tried. Horn v. State, 12 Wyo. 80, 143, 73 P. 705; State v. Lowry, 29 Wyo. 267, 274, 212 P. 768. No instruction was asked or given limiting the purposes for which such evidence should be considered. We do not hold that either the admission of this evidence or the failure to instruct as to its purpose was error. There was still other evidence of the same general character which we think was objectionable and, in the circumstances, prejudicial.

After it had been shown that appellant and Blanche Vines had lived together for several years and that they claimed a "common law marriage" justified their relation, Blanche, on cross-examination, was asked about her former marriage. She answered that her former husband was Robert Ritts, and that he had obtained a divorce. On further questioning, it appeared that she had assumed there was a divorce because Ritts told her he had obtained one, and showed her "some divorce papers." Thereafter, the state in rebuttal, over objection, was permitted to introduce in evidence the files in a divorce action by Robert Ritts v. Blanche Ritts, commenced in the Crook County district court in 1927. The petition charges that defendant in 1926, "disregarding the solemnity of her marriage vows, wilfully and without cause deserted and abandoned the plaintiff." The other papers show service of process on defendant by publication. The clerk of court, who identified the files in the divorce action, was then permitted, over objection, to testify that no decree of divorce was ever entered in the action.

From this evidence, it would be inferred that appellant's claimed wife, his co-defendant and principal witness, was guilty of either adultery or bigamy in her relation with him, and also that she had wilfully de-

serted her former husband. The evidence also affected the character of appellant by showing that he was guilty of adultery in living with a married woman. It might be claimed that the reason for admitting the record in the divorce case was because of its bearing on the question of the bias of Blanche, a witness. The relation of a witness to a party may be proved either on cross-examination or by extrinsic evidence, for the purpose of showing bias. State v. Wilson, 32 Wyo. 37, 52, 228 Pac. 803; State v. Slane, (Wyo.) 41 P. (2d) 269, 273. And we may concede that the admissibility of evidence for that purpose is not affected by the fact that the evidence may also show that the witness or a party has been guilty of misconduct. See Wigmore on Evidence, § 216; Horn v. State, 12 Wyo. 80, 143, 73 Pac. 705; Richey v. State, 28 Wyo. 117, 130, 201 Pac. 154. But evidence which is unnecessary and unimportant on the question of bias, and which is inadmissible for any other purpose, ought to be excluded. See Wigmore on Evidence, § 216; People v. Vertrees, 169 Calif. 404, 146 Pac. 890; People v. Lucich, 111 Calif. App. 293, 295 Pac. 593; Hughes v. City of Detroit, 161 Mich. 283, 126 N. W. 214, 137 Am. St. Rep. 504; People v. Richardson, 222 N. Y. 103, 118 N. E. 514; Israel v. Baker, 170 Mass. 12, 48 N. E. 621. In this case there could be no doubt in regard to the bias of the witness who was living with appellant as his wife, and, according to the charge in the information supported by the testimony of Reel, was jointly implicated in the crime. We think the record in the divorce case was of no value to the state on the question of the bias of the witness, and that it was used for the purpose of showing the bad character of the witness and the appellant. The appellant is denounced, even in the brief in this court, as a man "who had the audacity to testify that Blanche Ritts, a married woman, was his common law wife"; again as one whose "so-called common law wife

was, in fact, the wife of another man," and again as one who had "little regard for the solemnity of matrimony."

The fact that Blanche had not been divorced from, but had wilfully deserted, her former husband, was clearly inadmissible, to show the bad character of the witness and appellant. We may grant that a witness may be cross-examined in regard to his occupation, associations, etc. (State v. Pinkston, 33 Wyo. 428, 240 Pac. 219), and even as to specific instances of misconduct, that may affect his character and therefore his credibility, but the inquiry, as an attempt to show bad character, stops with the questions and answers. Extrinsic evidence to contradict the witness is not admissible. Eads v. State, 17 Wyo. 490, 503, 101 Pac. 496; Anderson v. State, 27 Wyo. 345, 373, 196 Pac. 1047.

It may be argued that this evidence was unimportant, and the error in admitting it not prejudicial. We cannot accept this view. We do not know what the jury thought of the evidence, but there can be little doubt that the state thought it was important and that it should be considered for the purpose of showing appellant's bad character. We do not hold that character evidence erroneously admitted would justify a reversal, if guilt were more clearly shown. When guilt is clear, errors or instances of unfair conduct by the prosecution may sometimes be ignored; but the greater the doubt of guilt, the more likely are errors to affect the substantial rights of the accused. People v. Caruso, 246 N. Y. 437, 159 N. E. 390; People v. Lewis, 313 Ill. 312, 145 N. E. 149. In this case there is doubt that the verdict is correct. There is even doubt that it is supported by substantial, credible evidence. The jury had to decide not only the question of guilt but a question of punishment. If Reel told the truth, appellant did not plan a murder, but was guilty of murder because he planned a robbery and was responsible for

the acts of Reel in carrying out the plan. Appellant, though guilty, had a right to hope for a qualified verdict that would prevent a sentence of death. This improper character evidence may have turned the scales against him on the question of punishment, if not on the question of guilt.

Appellant offered to prove that since his arrest the officers having him in custody had resorted to threats and trickery in an effort to extort a confession, and that Blanche Vines had been subjected to the same treatment. We think the court did not err in sustaining an objection to this evidence. The state made no claim that either appellant or his wife had made any confession or damaging admissions. We are cited to no authority for holding that a defendant is entitled to show the state's unsuccessful efforts to obtain a confession.

Other assignments or error in regard to the admission or exclusion of evidence do not require specific mention. The same questions will probably not arise on another trial.

The judgment will be reversed and the case remanded for a new trial.

BLUME and RINER, J. J., concur.