Brown v. The State.

No. 12,852.

BROWN v. THE STATE.

| 105 | 385 |
|---|---|
| 128 | 195 |
| 105 | 385 |
| 133 | 690 |
| 105 | 385 |
| 136 | 287 |
| 105 | 385 |
| 145 | 20 |
| 105 | 385 |
| 148 | 700 |
| 148 | 704 |
| 149 | 406 |
| 149 | 407 |
| 105 | 385 |
| 155 | 270 |

CRIMINAL LAW.—*Instructions.—Harmless Error.*—Verbal inaccuracies in instructions, or technical errors in the statement of merely abstract propositions of law, are not available for the reversal·of the judgment, where they result in no substantial harm to the defendant, and where, taking the instructions as a whole, the jury are correctly charged in respect to the law applicable to the facts in the case.

SAME.—*Reasonable Doubt.*—An instruction on the subject of reasonable doubt, that in order to justify an acquittal, the doubt must "arise out of the evidence in the case," and be such as to cause a prudent man to hesitate "in the gravest and most important affairs of life," is erroneous. The evidence must be such as to produce in the minds of prudent men such certainty that they would act upon the conviction produced without hesitation in their own most important affairs.

SAME.—*Indictment.—Murder.—Mortal Wounds Inflicted by Different Instruments.—Jury Need not Determine Which Caused Death.*—Where the infliction by the accused upon the deceased of two mortal wounds with different instruments, resulting in death, is charged in separate counts of an indictment, the jury may find the defendant guilty as charged in both counts, without determining which wound was the immediate cause of the death..

SAME.—*Evidence.—Threats.*—Upon the trial for murder of one who has killed a rival suitor, evidence of a general threat made by the defendant to kill any one whose attentions should be received by the object of his jealous regard, is admissible.

From the Madison Circuit Court.

*M. S. Robinson* and *J. W. Lovett,* for appellant.

*D. W. Wood,* Prosecuting Attorney, *W. R. Pierse* and *C. B. Gerard,* for the State.

MITCHELL, J.—At the June term, 1885, the grand jury ·of Madison county, by a formal indictment in two counts, ‾made presentment to the circuit court, that, on the 24th day ·of April, 1885, Luther F. Brown had feloniously and with premeditated malice murdered Eli F. Cummins.

In the first count, it was charged that the mortal wound had been inflicted with a knife. In the second, the charge was that the killing was by the use of a stone.

The accused, having pleaded not guilty, was tried by a jury. He was found guilty as charged, of murder in the first degree, and his punishment fixed at imprisonment for life. Over a motion for a new trial, judgment was rendered upon the verdict.

To reverse this judgment the record is brought here on appeal, with an assignment that the court erred in overruling the motion for a new trial. The evidence is voluminous and is set out in the record.

It appears that the deceased and the accused were young men residing in the same neighborhood. Some time prior to the homicide, the accused had been accustomed to call upon and was in apparent favor with a Miss Ayleshire, the daughter of a neighboring farmer. At the time of the homicide, and for some months before, the deceased had seemingly obtained the greater favor with the young lady, and the visits of the accused had from some cause been discontinued. The evidence tends to show that some ill feeling had been engendered between the two young men. On the night of April 24th, 1885, the young lady had invited some of her friends to an entertainment at her father's house. The deceased was present, with others, by her invitation. The accused came, as he asserts, upon the invitation of the deceased. Both were members of a string band, and the claim of the accused is, that he was invited to be present to assist in furnishing music for the occasion. For some reason his presence was distasteful to Miss Ayleshire, and she so intimated to him soon after his arrival. Upon this intimation he quietly withdrew from the house, but remained in the yard between the house and barn in company with a half brother. There is evidence tending to show that while he and his relative were in the yard, probably an hour after he withdrew from the house, word was brought to the father of the young lady that the accused was making threats of violence against the deceased. The evidence, on behalf of the State, tends to show that Mr. Ayleshire thereupon went out and admonished him to leave

his premises and go home, saying to him that there must be no disturbance at his house, and that that was no place to settle disputes.

The testimony of the accused is to the effect that Mr. Ayleshire invited him back into the house. Soon after this interview, in some manner not fully disclosed in the evidence, the deceased and accused met at or near the door of Mr. Ayleshire's house. An altercation and scuffle of brief duration ensued. The accused was overmatched, and with his relative again retired from the scene to a shed or barn near by and adjacent to a path or highway leading from the house.

Here he remained until the fatal encounter occurred.

The State's evidence tends to support its claim, that the purpose of the accused, in going to and remaining under the shed by the public highway, was to lie in wait for and intercept the deceased, so as to re-engage him in the contest or controversy on his way home.

The claim of the defence is, that the purpose was to take shelter from a slight rain storm which came on, and prevailed a part of the time during which he remained there, and to wait for friends, who were going his way home. Before going to the shed, and after the first altercation, the accused, upon the pretext that he wished to use it about his work the next day, borrowed a pocket-knife of his relative, which he kept in his possession while he remained under the shed. The entertainment progressed, without interruption, until about 12 o'clock, when the guests separated to go to their respective homes. The way of the deceased lay by the shed under which the accused had for some purpose taken shelter. Others passed the same way slightly in advance of the deceased. When opposite, or a short distance beyond the shed, the evidence tends to show that the deceased was accosted by the accused with a reference to the cause of the previous altercation, which involved a question of veracity between them. Angry words ensued. Epithets were exchanged. A fight was proposed. The deceased put down his violin and the box in which it

was contained, and went a short distance in the direction of the accused, then turning away, with the statement that he would "not fight any man who fought with a knife," took up his box and violin and started on his way homeward.

There was evidence tending to show that after proceeding about fifteen feet, the deceased turned his head partially round to look in the direction of the accused, when he was struck on the forehead, about one inch above the left eyebrow, with a missile thrown by the accused. He was seen to stagger and throw his hands up to his head, going in the direction of the barn. The accused met him, and, as the witnesses describe, the two "clinched" and "struggled" with each other. The deceased threw the accused, and seemed to try to stamp upon him, without success. The accused got up and they "clinched" and "struggled" again, when both seemed to fall, the accused on top. Thus the contest ended.

Discovering that the deceased was seriously hurt, and unable to walk, the bystanders carried him back to the house from which he had departed a few minutes before, where he died in two or three minutes afterwards. The accused sustained no injury to speak of. Six wounds were found upon the person of the deceased, two of which were mortal. One was produced by a blow on the forehead with a missile which fractured the skull, another with a knife which penetrated his left side or breast, in the vicinity of the heart.

The accused admits in his testimony that he threw at and hit the deceased with a stone, and that he cut him with a knife. That he killed him is not disputed. The claim is that it was done in self-defence. It is argued that at most the offence did not rise to either degree of murder.

Without entering upon a discussion of the evidence, of which the foregoing statement presents only very briefly an outline of some of the most salient points, we can not concur in the view so elaborately presented. An examination of the evidence has led to the conviction that it not only tends to support the verdict, but that a verdict of murder in one or

the other degree must have resulted, unless every account of the fatal tragedy, and the circumstances which led up to it, except that given by the defendant himself, was discredited and disbelieved; indeed, the defendant's statement shows but little in mitigation of the crime.

The jury may well have believed that the accused went unbidden where the deceased was an invited guest; that his threats brought on the first collision, after he had been courteously admonished to depart; that, smarting under temporary discomfiture, he armed himself with deadly weapons— a knife and stone—and lay in wait for hours for the purpose of renewing the conflict with his antagonist, and that he struck the first deadly blow after the deceased declined a conflict and was retreating to avoid further encounter with a " man who fought with a knife."

That the deceased, after receiving a mortal wound at the hands of his assailant, may have " staggered" towards and grappled with him, in no way mitigates the infliction of other wounds with the knife, one of which was surely and speedily fatal. We can not disturb a verdict supported by evidence such as that exhibited in this record, nor do we think it necessary to enter upon a critical examination of the law of self-defence. Upon the defendant's own statement there is no room for the application of any of the principles governing the defence of one's person.

The instructions given by the court to the jury are made the subject of general criticism. Some of them are specifically assailed in the argument. Some of the objections relate to mere inaccuracies of expression, as, for example, in the first instruction, the court inadvertently told the jury that the first count of the indictment alleged the killing to have been done with a stone, and the second with a knife, whereas, in fact, the first charged that the fatal wound was inflicted with a knife, and the second with a stone. So, in the second instruction, the jury were told that " the defendant is presumed to be innocent of all the *crimes* charged in the indictment,"

etc.   The verbal inaccuracies may be admitted, but that any prejudice to the defendant could have resulted on that account can not be seriously maintained.

In the third instruction the court undertook to define what constituted a reasonable doubt.   The jury were told, in substance, that it was not their duty to go beyond the evidence in search of doubts, based on merely groundless conjectures; that in order to justify an acquittal the doubt should be reasonable, and arise out of an impartial consideration of the evidence in the case, and that it must be such a doubt as would cause a prudent and considerate man to hesitate before acting in the gravest and most important affairs of life; that if upon a careful and impartial consideration of all the evidence, the jury had an abiding conviction of the defendant's guilt, then they were satisfied beyond a reasonable doubt.

We can not commend this instruction.   It is not an accurate statement of the law upon the subject of reasonable doubt.   To the extent that the instruction was liable to be understood as saying to the jury that in order to justify an acquittal, the doubt of the defendant's guilt must arise out of the evidence and be such as to cause a prudent man to hesitate before acting in matters of the gravest concern, it was clearly wrong.   It is not the law that in order to justify an acquittal the doubt must arise out of the evidence given, and be such as to cause a prudent man to hesitate.   The doubt may arise from a want of evidence.   In order to justify a conviction the evidence must be such as to produce in the minds of prudent men such certainty that they would act upon the conviction produced without hesitation in their own most important affairs.   Jarrell v. State, 58 Ind. 293; Stout v. State, 90 Ind. 1.   The instruction is subject to criticism in other particulars.

There are other instructions in the record, of which it might be said they are not technically accurate as abstract statements of the law.   Upon an examination of all the instructions, however, as applied to the evidence in the case, we are of opinion that no substantial injustice resulted to the de-

fendant.   The principal facts in the case were not seriously in dispute, nor could there have been any grave doubt upon any point material to a conviction.

A careful consideration of all the evidence leaves no room for doubt in our minds, that, notwithstanding the court may have in some degree erred in the statement of merely abstract propositions of law, the jury were, taking the instructions as a whole, correctly charged in respect to the law applicable to the facts in the case.   The conclusion was inevitable, upon any justifiable theory of the evidence, that the jury must have found the defendant guilty of murder in one or the other degree.

The statute wisely provides in respect to appeals in criminal cases, that, " In the consideration of the questions which are present, upon an appeal, the Supreme Court shall not regard technical errors or defects or exceptions to any decision or action of the court below, which did not, in the opinion of the Supreme Court, prejudice the substantial rights of the defendant."   R. S. 1881, sec. 1891.

Considering all the instructions given, it appears that the jury were, in respect to all that was material to enable them to arrive at a correct result, properly instructed.   However much we may regret the giving of instructions which are subject to criticism, we can not, in view of the statute, reverse the judgment for the errors which may have intervened, on account of inaccuracies or merely abstract misstatements of law found in some of the instructions.   *Epps* v. *State*, 102 Ind. 539.

On behalf of the defendant, ten instructions were presented and refused by the court.   The first was to the effect, that unless the jury were convinced beyond a reasonable doubt, that the death of the deceased was immediately caused by a blow upon the head, and that the blow was inflicted by the defendant, they must acquit, so far as the second count was concerned.   This instruction was properly refused.

There was no dispute but that the blow on the head was

inflicted by the defendant. The evidence tended to show that two of the wounds found upon the body of the deceased were probably, and almost certainly, mortal. It was not material that the jury should have been convinced beyond a reasonable doubt which particular wound was the immediate cause of the death.

If they found that two mortal wounds were inflicted by the defendant, as charged in the several counts of the indictment, and that death resulted therefrom, they were authorized to find the defendant guilty as charged in both counts, without determining which wound was the immediate cause of the death.

Most of the instructions asked related to the subject of self-defence. It may be said, they are, as abstract statement of law, correct. We are, however, unable to discover any evidence in the record which makes the law of self-defence applicable to any extent. Besides, the law relating to the right of self-defence was stated to the jury in a substantially accurate instruction given by the court.

The only other ruling complained of relates to a decision of the court in admitting certain evidence offered by the State.

As already stated, some ill feeling seems to have been engendered in respect to the relations of the deceased and the accused with Miss Ayleshire. The defendant had been her suitor. He had been supplanted by the deceased. This lady, having been called as a witness for the State, the following question was propounded to her: "I will ask you to state what, if anything, Mr. Brown ever said to you about killing anybody that ever went to see you?" Over the defendant's objection she was permitted to answer, as follows: "I never heard him make any threats against any particular one. He said he would kill any one if I received their company, but him."

This evidence was clearly admissible for what it was worth. If true, it tended to show that the killing was premeditated; that it was the execution of a purpose to destroy the life of

any one who might be preferred in the esteem of the witness to himself. As exhibited by the record, the inspiring motive which impelled the defendant in the bloody tragedy seems to have been a feeling of base and uncontrolled jealousy.

We think the verdict was right on the evidence, and notwithstanding the technical misstatements of the law already alluded to, it so clearly appears that these were not influential in producing a result which must have been reached in any event, that no substantial injury was done.

The judgment is affirmed, with costs.

Filed March 30, 1886. Petition for a rehearing overruled May 15, 1886.