THE STATE OF WYOMING,

*Plaintiff and Respondent,*

vs.

ELMO DEMPSEY SPEARS,

*Defendant and Appellant.*

(No. 2729; July 24th, 1956; 300 Pac. (2d) 551)

84

For the defendant and appellant, the cause was submitted upon the brief of Goppert & Fitzstephens of Cody, Wyoming, and oral argument by E. J. Goppert.

For the plaintiff and respondent the cause was submitted upon the brief of George F. Guy, Attorney General, Robert H. McPhillamey, Deputy Attorney General, Howard B. Black, Walter J. Muir, and Arthur F. Fisher, Assistant Attorneys General, of Cheyenne, Wyoming, and oral argument by Mr. Fisher and Wilbur O. Henderson, County and Prosecuting Attorney, Big Horn County, of Basin, Wyoming.

Justice Parker delivered the opinion of the court.

## OPINION

A charge of first degree murder was filed against the defendant, Elmo Dempsey "Johnny" Spears; and a jury in Big Horn County on June 11, 1954, found him guilty of murder in the second degree, adding to their verdict the longhand notation of their foreman, "Because of extenuating circumstances, the jury recommends leniency." The court sentenced the defendant to a term of twenty to twenty-five years in the penitentiary and from this verdict and judgment, the defendant appeals.

The evidence is undisputed that the defendant fatally shot Raymond Bookout in the abdomen with a .38 Colt police pistol about 5:30 P.M. on Thanksgiving Day, November 26, 1953, in the back lounge of the Shoshone Bar at Lovell, Wyoming. Death, caused by the gunshot wound and the resulting peritonitis, ensued on December 8, 1953.

Defendant, twenty-five years of age at the time of the shooting, was born on October 10, 1928, at Canute, Oklahoma, where he received his grade school education. At the age of sixteen, he was married to Mabel Gifford of Lovell, which has been their home since that time. Except for a year's service in the army, he had

worked as a steady employee of the Ohio Oil Company in the Bryon-Garland oil field for some eight years. He had a good work record with his employer until a relatively short time before the incident in question, when he became forgetful, absent-minded, and undependable. He was laid off by the company on October 21, 1953, on which occasion while he was looking after a tank of oil he allowed it to run over; and when the company representative went to talk to him about the matter, he was asleep.

The Spears had acquired their home in Lovell in 1947 under the provisions of the G.I. loan. They had two children and, according to the testimony, appeared to get on very well until September 1953 when Mrs. Spears advised the defendant that she was suing him for divorce. The record is not entirely clear regarding all of their difficulties, but apparently part of the trouble arose because of defendant's long hours of work. In addition to his employment by the Ohio Oil Company, he often worked for ten hours a day additional as a contract welder and was thus away from home a great deal.

After Mrs. Spears' threat of divorce in September 1953, she left home and caused divorce papers to be served on the defendant. During the period of this difficulty, he consulted a doctor, and when he was advised to take a vacation, went to see his parents in Oklahoma. He returned to Lovell on November 8, 1953, and immediately sought his wife in an attempt to become reconciled; but she refused to return to the home. Later that week, the two of them went to discuss their situation with Father Brady, a Lovell priest. Saturday night, November 14, 1953, defendant attended a birthday party where he again talked to his wife about their marital problems. She told the defendant at that time

that she had "gone out a few times with Ray (the deceased)." Mrs. Spears returned to the defendant's home that night; and they lived together until November 26, 1953, Thanksgiving. On Monday or Tuesday, the 16th or 17th of November, 1953, Mrs. Spears told the defendant about having had a date for the following Sunday with Bookout, but she said she had broken the date and told him she wouldn't go out. The following Saturday night defendant and his wife went to a show. When she went out for a smoke, he followed and saw Lee Parks and Bookout standing in the lobby talking. Defendant went over and asked Bookout if he could see him sometime "whenever he got time," to which Bookout replied, "sure Johnny, any time." Defendant testified, "I wanted to tell him not to call my wife any more, leave her alone. * * * I never seen him again until Thanksgiving Day. * * * my wife, after we got home, she told me she said Ray and her went to school together; there was nothing between them, never had been, never would be."

On Thanksgiving Day, defendant had a job fixing a hay chopper for one Jack Snyder, and on the way back had a little job of welding at the Lovell city water plant. He had his gun belted on as he had been "target practicing" and in returning through town stopped to talk to Kirk Emmet about a job. He later went to the toilet at the rear of the Shoshone Bar.

Inasmuch as defendant's counsel at various times during the presentation of the State's case admitted the shooting of Raymond Bookout, and defendant himself later testified voluntarily regarding the occurrences in the bar immediately prior to the shooting, and since the State's evidence agrees substantially on the major points, it serves no useful purpose to recount the testimony of various witnesses.

Defendant's statement, which must be assumed to have been favorable to him, was competent evidence; and the jury was entitled to believe it if they chose. His story was as follows:

"As I was about almost to the end of the bar here, there was a fellow grabbed me by the shoulder and says: 'what the hell does he want to see me about'. I looked up and seen it was Ray. I told him, I says I am going back to the toilet, I'll be right back, and I'll buy you a drink. So I went on back to the toilet. When I came out, he was there, talking to Joe Good * * * . I stood at the end of the bar, and they finished talking. He came on back, and got a booth, and I bought him a drink. * * * (Bookout asked) 'what did you want to see me about Johnny; I guess you want to see me about your wife, don't you'. I said, 'Well, Ray, I don't want you to be calling her any more'. I said 'you know she is all through with you, and I said 'she is mine, and I intend to keep her'. He says: 'I think she is a mighty swell person, myself, and I think a hell of a lot of her.' I said 'I do too; she is my wife; you better leave her alone.' He said 'until your wife tells me that, I won't leave her alone. I'm calling as I please'. I said if you do, Ray, 'I'll shoot you'. He said 'that gun don't scare me, a darned bit.' * * * I pulled it out and showed it to him, and put the gun back in my pocket. He said 'it don't scare me a damned bit. I can shoot just as good as you can. I have got a gun as good as yours. Until Mabel tells me, I'm not going to stay away. You mess with her one more time; she'll be mine.' I said 'don't bother her any more, Ray'. He said 'well, it's just like this, until she tells me, I won't stay away'. I said 'you better, Ray, or I'll shoot you'. He said 'are you carrying your gun.' I said, 'yes, if you are carrying yours'. He stuck out his hand and said 'yes, sir'. I got up, left the bar and went home. I told my wife approximately

what he said. I called Chris Lynn.. I asked him for a permit for me to carry my gun. He said he wouldn't give me one. I asked him if it was illegal to carry a gun in the open. He said it wasn't. He said, besides, you don't need to carry a gun. Well, I said, this guy has been chasing around with my wife, won't leave her alone, threatened to shoot me. I want to protect myself too, if he doesn't stay away. He said 'I wouldn't do it'. I said what would you do, if you was in that fix. He said, 'I don't know, but I shouldn't do it. My wife asked me if I would take her back to the bar, so she could tell Ray that they were all through * * * . * * * I took her down there. * * * We took a booth, and went back and set down and ordered a drink. * * * I didn't see Ray when I first went in. * * * I asked him (the bartender) if Ray went in there. * * * I said, 'If you see him up front there, tell him to drift back this way, I want to see him'. * * * I turned around and looked back up there, I see Ray in front. * * * He was up there with a lady friend of his. * * * He was kissing her, when I walked up. * * * I asked him if he would come back to the booth. I said 'my wife is back here.' And he said 'okay, let's go'. He went back and sat down. I ordered him a drink. * * * My wife said, 'Ray, there has never been anything between us; there never has been anything between us; that is the way I want you to tell John.' About that time, Harry (the bartender) brought the drink up, set it down and left. She told him, she said, 'now we went back together and we intend to stay together; just don't be bothering us any more.' She said, 'I really and truly love Johnny, and I know he loves me.' Ray said — I don't know just exactly what he said along about then. He said something to her, and he was kind of quiet about it, and then be began to laugh about it. He said to me, 'I think you got an awful pretty wife, Johnny.' He said that if

she was mine, I would really take care of her. I said, 'she isn't yours, she's mine, and I intend to keep her'. He said, 'I don't want to stay with you,' and started to laugh again. He said, 'hell besides, if you wasn't here, you son-of-a-bitch, I could really make it with her.' He reached out and grabbed hold of my wife's hand or arm some place along there. He said 'remember that night up at Byron, you weren't such a hot chunk up there. You don't need to give me the slip now.' I blowed up; I passed clear out; then I heard a deep rumble, and he was lying up against my shoulder. I set him down in the booth, and I hollered for Harry to call the doctor * * *."

The fifteen specifications of error filed herein are, for the purpose of argument, consolidated by counsel into seven main points which will be discussed in the order in which defendant has presented them.

1. Right to Preliminary Hearing and to Compel Attendance of Witnesses.

As his first point, defendant insists that (a) being charged with a felony he was entitled to a full and complete preliminary hearing, and (b) he had a right to have recalcitrant witnesses forced to appear and testify.

Defendant was originally charged on December 9, 1953, in the court of O. E. Nowels, justice of the peace. On January 11, 1954, within thirty days immediately preceding the first day of a regular term of court, the prosecuting attorney filed an information in the District Court of Big Horn County. To this, the defendant filed a "Motion and Plea in Abatement," charging that the information of the district court was improperly issued. The court overruled the plea in abatement and the incidental motion for preliminary hearing but

quashed the warrant, as being improperly issued. On January 26, 1954, the prosecuting attorney filed a second direct information in district court against which defendant filed a "Motion and Plea in Abatement" in which he insisted upon a preliminary hearing. The prosecuting attorney in open court agreed and consented that defendant have a preliminary hearing, and the court thereupon entered an order sustaining defendant's said motion and plea.

The resulting preliminary hearing held before O. E. Nowels, justice of the peace, on February 18, 1954, is now claimed by the defendant to have been improper, primarily because of (a) the form of Nowels' decision in finding the defendant "guilty" and failing to mention "probable cause" until prompted by the prosecuting attorney and (b) Nowels' denial of defendant's motion for a continuance and for the attachment of witnesses Harry Schneider and Euretta Brewer, who had been subpoenaed by defendant during the latter part of the hearing and had failed to appear.

As authority for his right to a preliminary hearing, defendant cites §§ 10-310, 10-314, 10-316, 10-607, W.C.S., 1945, and quotes 14 Am.Jur. 935 and 22 C.J.S. 483, 484, 485. The latter reads:

"The purposes of a preliminary examination may be said to be three-fold: (1) To inquire concerning the commission of crime and the connection of accused with it, in order that he may be informed of the nature and character of the crime charged against him, and, if there is probable cause for believing him guilty, that the state may take the necessary steps to bring him to trial. (2) To preserve the evidence and keep the witnesses within the control of the state. (3) To determine the amount of bail. Such an examination is not available to accused for the purpose of ascertaining in advance the evidence relied on by the prosecution.

"In the absence of a statute no preliminary examination is necessary, the proceeding being unknown to the common law. Under the statutes, however, one accused of crime ordinarily is entitled to, and it is the duty of the committing magistrate or tribunal to grant him, a preliminary hearing before holding him for trial. The right to such a hearing, although recognized, as a substantial right, generally, is not a constitutional right, but is granted only when required by statute, and is subject to the limitations in the law creating the right; and accordingly, under some statutes, such a hearing is necessary only when the crime charged is a felony, and not when it is a misdemeanor. * * * "

A full perspective of this text requires a consideration of two sentences contained therein but *not* quoted by the defendant at page 483:

"A preliminary hearing, or as otherwise called a preliminary examination, is not a trial, in its ordinary sense, nor is the determination thereof a final judgment. It is simply a course of procedure whereby a possible abuse of power may be prevented, and accused discharged or held to answer, as the facts warrant * * * ."

Analysis of the complete C.J.S. authority quoted discloses the inevitable conclusion, apparent from the reading of many cases, that preliminary hearings are governed by statute and that a consideration of cases from other jurisdictions avail little. Accordingly, we turn to our own court for precedent in the consideration of the problem.

In State v. Tobin, 31 Wyo. 355, 368, 369, 226 P. 681, 685, Judge Blume, in discussing a gambling conviction, stated:

"Defendant was arrested on January 23, 1923, and brought before a justice of the peace, presumably to have a preliminary examination. No such examination was ever made, and the original information on this case was filed directly in the district court on January

30, 1923, and an amended information on March 8, 1923, without dismissal of the complaint filed in the justice's court. Defendant made a motion to quash the information herein on that ground. In the absence of a statute, no preliminary examination is necessary, the proceeding being unknown to the common law. 16 C.J. 314. While no doubt proper in all criminal cases where the justice has no original jurisdiction to try a case, the statute makes it necessary only in certain cases where the crime committed is a felony. Section 7431, W.C.S. 1920 (now § 10-607, W.C.S., 1945) * * *. * * * we think the motion to quash, so made, was properly overruled."

In State v. Vines, 49 Wyo. 212, 221, 223, 54 P.2d 826, 828, 829, the defendant, charged with murder, was arrested without a warrant on October 7, 1933, and on October 10 was charged by complaint filed with the justice of the peace. A warrant was served on him but he was not taken before the justice of the peace and the proceedings were dismissed on October 30. On October 31, within thirty days of term time, an information was filed in the district court. Vines filed a plea in abatement to which a demurrer by the State was sustained. The ruling was assigned as error; and in commenting on the matter, Judge Kimball first in-. dicated that he did not wish to dispose of the matter on a technicality regarding the propriety of a plea in abatement as opposed to a motion to quash and said:

"It is clear from our decisions that a preliminary examination is not necessary except when required by statute. State v. Sureties of Krohne, 4 Wyo. 347, 34 P. 3; Ackerman v. State, 7 Wyo. 504, 54 P. 228; State v. Tobin, 31 Wyo. 355, 368, 226 P. 681. The controlling statute is section 33-408. Rev.St. 1931 * * * (quoting the statute, which is identical to § 10-607, W.C.S., 1945).

* * * * *

"From appellant's discussion of the plea in abatement, it seems that his main purpose in asking for a pre-

liminary examination was to obtain knowledge of the facts the state expected to prove at the trial. He was really seeking a disclosure of the state's evidence in order that he might prepare his defense. It is clear that under our statute a preliminary examination is not for that purpose. If it were, there would be no reason for omitting it in those cases in which the information is filed within thirty days of the beginning of the term. There seems to be no rule of the common law or statute that gives a defendant the right before trial to pry into the state's case by obtaining a disclosure of its evidence, though there is authority for the view that the trial court has at least a discretionary power to permit the defendant to inspect documents or chattels for the purpose of obtaining information that will enable him to make a defense. (Citing cases) * * * "

Although neither State v. Tobin, supra, nor State v. Vines, supra, presents facts identical to the present situation, the reasoning of the court is clear that under circumstances such as existed in the case at bar a defendant is not entitled to a preliminary hearing as a substantial or legal right. We are unable to see from the record that the defendant was prejudiced by any alleged errors in the preliminary hearing.

"The general rule that to warrant a reversal, the error complained of must have been prejudicial, is applied * * * in criminal cases. The accused cannot complain unless it is made to appear from the record that he may have suffered prejudice. His substantial rights must have been sacrificed; and if the errors which he sets up are such as to have done no harm, the judgment will not be reversed. * * * " 3 Am.Jur. 560, citing Hollywood v. State, 19 Wyo. 493, 120 P. 471, 122 P. 588, Ann.Cas. 1913E, 218.

Regarding his request to have attachment of witnesses and a continuance until they were brought into court, defendant quotes Art. 1, § 10 of the Wyoming Constitution, "In all criminal prosecutions the accused

shall have the right * * * to have compulsory process served for obtaining witnesses * * *." He presents no authority or precedent to interpret or construe this proviso as he contends that it applies to the error of the justice of the peace, and he apparently assumes that it is self-explanatory and that any violation is automatically a ground for reversal. We recognize the importance of preserving the rights accorded in the provision, but a violation thereof does not automatically create reversible error. As was said in Adams v. U.S. ex rel. McCann, 317 U.S. 269, 281, 63 S.Ct. 236, 242, 87 L.Ed. 268, 143 A.L.R. 435, and quoted with approval in Buchalter v. People of State of New York, 319 U.S. 427, 431, 63 S.Ct. 1129, 87 L.Ed. 1492:

"* * * it is not asking too much that the burden of showing essential unfairness be sustained by him who claims such injustice and seeks to have the result set aside, and that it be sustained not as a matter of speculation but as a demonstrable reality.***"
See in re Curtis, D.C., 36 F.Supp. 408, affirmed, Curtis v. Rives, 75 U.S. App. D.C. 66, 123 F.2d 936, and Jones v. State, 94 Okl.Cr. 359, 236 P.2d 102. This view would seem to be especially justified in dealing with matters relating to a preliminary hearing.

22 C.J.S. 496 provides:

" * * * Technicalities or defects in the preliminary examination will not render it invalid unless they actually prejudice accused, or tend to his prejudice, with respect to some substantial right. (Citing State v. Clark, 4 Idaho 7, 35 P. 710; Lenoir v. State, 197 Md. 495, 80 A.2d 3; State v. Gunn, 102 Utah 422, 132 P. 2d 109.)"

There is no showing in the record that the failure of appearance of the witnesses subpoenaed by defendant created any prejudice against him, either substantial or otherwise.

Section 3-1705, W.C.S., 1945, provides:

"The court in every stage of an action must disregard any error or defect in the *** proceedings which does not affect the substantial rights of the adverse party; and no judgment shall be reversed or affected by reason of such error of defect."

2. Change of Venue and Conduct of Spectators.

Defendant filed a motion for change of venue of the action to another county because he could not "have a fair and impartial trial in Big Horn County." He supported the motion with his own sworn statement and twenty-four form affidavits of other persons. The affidavits were typewritten (some of them carbons) and all very similar as to wording, many of them exactly the same, all containing blank spaces which had been filled in to conform to the situation regarding each affiant. One of the forms of affidavit used, which is representative of the entire group, is as follows:

"_____, being of lawful age and first duly sworn according to law deposes and says:

"That he has resided in _____, Big Horn County, Wyoming, for the past _____ years; that he has heard considerable discussion in the community in which he resides concerning the killing of Ray Bookout by Elmo Dempsey Spears which was the result of a gunshot wound inflicted on November 26, 1953 at the Shoshone Bar in Lovell, Wyoming;

"That he has had conversations with several people in the Lovell community, and from those conversations he has come to the conclusion that said Elmo Dempsey Spears cannot have a fair and impartial trial in Big Horn County, Wyoming;

"That Ray Bookout was a member of the large Sessions family which has at least _____ members in the northern portion of Big Horn County, Wyoming, and said shooting and the subsequent death of said Ray Bookout has created so much adverse sentiment

toward said Elmo Dempsey Spears that he will not be able to get a fair and impartial trial in Big Horn County, Wyoming.

"AND THAT FURTHER AFFIANT SAYETH NOTHING.
"

The prosecuting attorney filed an "Answer to Affidavit for Change of Venue" purporting to deny the allegations of defendant. The order of the district court shows that defendant's motion for change of venue came on regularly for hearing and that after argument by counsel the motion was overruled. Many authorities are cited by defendant to show that there was abuse of discretion by the court in the overruling of the motion. The statute applicable in a request for change of venue is § 3-1906, W.C.S., 1945, which provides, inter alia:

"The defendant in a criminal action may make an affidavit stating that he believes he cannot receive a fair trial owing to the bias or prejudice of the judge or the excitement or prejudice against him in the county

* * * if the affidavit sets forth that there is excitement or prejudice in the county against the defendant, the prosecuting attorney may thereupon traverse by his affidavit the allegations of defendant, and the court or judge shall thereon set down the issue so presented for trial before him at a stated time, at which time both parties shall appear and support their respective affidavits by witnesses examined orally or by affidavits, and if it appears to the court or judge, upon such hearing, that the trial would be more impartial in another county, the application shall be granted * * * "

The defendant did not literally follow the statute in the affidavits filed, nor did he support them by witnesses at the time of the hearing. Inasmuch as our statute relating to change of venue is quite definite and this court has previously passed upon the subject,

general authorities and cases from other jurisdictions, even if based on facts substantially similar to the instance under consideration, would not be persuasive.

In State v. Vines, 49 Wyo. 212, 224, 225, 54 P.2d 826, 829, the court discussed a situation similar in many respects to the one at bar, in which defendant offered in evidence fifty-one affidavits in support of a motion for change of venue, each affiant swearing

" 'that there is a wide-spread feeling of prejudice' in the county against the defendant" so that he could not have a fair trial there. Some of the remarks of the court seem to apply to the instant case.

" * * * It seems to be the general rule that affidavits stating the conclusions of the affiants, with no facts to support the conclusions, have little or no weight. (Citing cases.) * * * Of course, affidavits of opinions or conclusions, alone relied on, furnish no basis for granting a change of venue, but apparently the practice is to receive them in evidence, probably on the theory that the court may conclude from other evidence that there is basis in fact for the opinions expressed in the affidavits. In the case at bar we do not think there was any other evidence from which the trial court should have found that there were facts to justify the conclusions stated in the affidavits. * * * "

Although the Vines case was reversed on another point, it seems clear that the affidavits filed therein were considered to be insufficient.

In State v. Hambrick, 65 Wyo. 1, 19, 20, 196 P.2d 661, 666, 198 P.2d 969, the court discussed a motion for change of venue supported by eight affidavits to the effect that the people of Carbon County were prejudiced against defendant and that she could not receive a fair trial in that county. On the hearing, defendant and one witness testified and several persons were called on behalf of the prosecution. The court, in com-

menting on the matter, quoted 22 C.J.S. 310 with approval:

" 'The question to be determined is whether or not there is reasonable ground for fear that the alleged prejudice actually exists, and that accused will not receive a fair trial. It is not sufficient merely to show that great prejudice exists against accused; it must appear that the prejudice against him is so great or so general as to prevent him from receiving a fair and impartial trial.' "

Continuing, the court said:

"Whether or not a change of venue should be granted is ordinarily within the sound discretion of the trial court. 22 C.J.S. 323. It is only when that discretion has been abused that an appellate court can intervene, and whether such abuse exists is often, if not generally, a most difficult point to determine. * * * ."

Considering the pattern of the affidavits filed in this case, the lack of *facts* stated therein, defendant's failure to comply with the statute, § 3-1906, W.C.S., 1945, in supporting the "affidavits by witnesses examined orally or by affidavits" or to request an opportunity to do this, and the omission of even a suggestion of prejudice or sentiment adverse to defendant *throughout* the *entire* county, we find in the record no indication of the trial court having abused its discretion or of defendant being deprived of a fair and impartial trial because of a denial of change of venue. The burden is upon the defendant to make a showing that he has sustained prejudice by reason of the failure of the court to grant him a change of venue, and this burden has not been sustained. See Jones v. State, 94 Okl. Cr. 359, 236 P.2d 102.

Although defendant's counsel do not list the matter of the conduct of the spectators as one of the main points in the case, they devote some discussion to it

in both the brief and the oral argument and insist that the conduct of the spectators created an atmosphere of hostility and unfriendliness toward the defendant. They indicate that there was reversible error because the trial court did not grant a mistrial for this reason. Counsel referred to an oral denial by deceased's father of a statement made by one of defendant's attorneys in his closing argument. The only impropriety indicated by the record is that occurring during the cross-examination of defendant when reference was made to a conversation with Forrest "Frosty" Eastman when at one time the court said, "there will be no disturbance," thereby indicating that there had been some untoward act by the audience. The general rule regarding the conduct of trials is well stated in 53 Am.Jur. 55:

"In the administration of justice, the judge is charged with the preservation of order in his court and with the duty to see that justice is not obstructed by any person or persons whatsoever. A large measure of discretion resides in the court in this respect, and its exercise will not be reviewed or disturbed on appeal unless it appears that prejudice resulted from the denial of a legal right. * * * "

See also 53 Am.Jur. 692 and Annotations at 12 L.R.A. (N.S.) 98 39 L.R.A. (N.S.) 667, and L.R.A. 1918E, 959.

To say that any prejudice resulted to the defendant from the conduct of the spectators would amount to speculation, and we think that there is nothing before this court indicating the trial court's abuse of discretion in maintaining order at the trial.

3. Threats Against a Class.

Defendant urges that the court erred in permitting Marie Sanders to testify as follows: "Well, it was about a mile this side of Frannie. We had a flat tire,

and Johnny got out to fix it, and he asked for his gloves, and I reached in the cubby hole, and there was a gun in it, and I asked him if it was loaded, and he said 'yes', and he said that there was three bullets in it, one for Mabel, if she divorced him, and if that didn't get her, the second one; the third that was for any son-of-a-bitch he caught out with her." The alleged error is predicated upon the viewpoint that the statement refers to a class of persons and is therefore inadmissible against defendant; and defendant insists, though not convincingly, that the prosecuting attorney thereafter adopted the theory that the deceased had not been out with defendant's wife and was therefore not even within the class. In support of his objection, defendant quotes 40 C.J.S. 1110 as follows:

"As a general rule, general threats to kill, not shown to have any reference to deceased, are not admissible in evidence, but a threat to kill or injure some one not definitely designated is admissible where other facts adduced give individuality to it.

"General threats by accused to kill or injure some one, or statements showing a general malevolent spirit, which are not shown to have any reference to deceased are not as a rule admissible on the question of malice, deliberation, or premeditation. * * *

"In order that threats, claimed to have been made against deceased, may be admissible, the language used, or the circumstances under which it was used, must be broad enough to include deceased within its terms.

" * * * *Threats to do violence to a class of persons, one of whom became the victim, are admissible to show malice and state of mind, even though no particular person was named by accused.* Thus threats against peace officer or officers or members of a particular family are admissible, where deceased was a member of the class referred to. *Evidence of threats against a class, however, is not admissible when the*

*cause of the fatal difficulty did not relate to the connection of deceased with such class.*" (Emphasis supplied by defendant.)

In the portion of the above text which defendant omits, we find a statement which we think is most meaningful and fully relevant to the instant case:

" \* \* \* General threats not referring to anyone in particular, however, may be admissible under certain circumstances. Thus a general threat to kill or injure someone, not definitely designated, is admissible when other facts adduced give individuality to it so that, as it is generally held, the jury may infer that the threat referred to deceased, or when the threat was made shortly before the commission of the crime to which it may be construed to refer. (Citing many cases.)" To the same effect see 26 Am.Jur. 403, citing Annot., 89 Am.St.Rep. 691, 698.

Since most of our criminal law has its source in Indiana, it is significant to review that State's law on the subject. In Brown v. State, 105 Ind. 385, 5 N.E. 900, 905, a prosecution for murder, the lady, with whom defendant had been supplanted by deceased, was permitted to testify over the defendant's objection:

" 'I never heard him make any threats against any particular one. He said he would kill any one if I received their company, but him.' " The court in discussing the matter said: "This evidence was clearly admissible for what it worth." To the same effect are Parker v. State, 136 Ind. 284, 35 N.E. 1105; Wheeler v. State, 158 Ind. 687, 63 N.E. 975; Johnson v. State, 201 Ind. 264, 167 N.E. 531, all holding in substance that to authorize proof of threats, whether general or special, it is necessary only to show that the person injured is within the scope of the threats uttered.

Under the last stated philosophy, the evidence was admissible, especially in the light of defendant's own

connective testimony that on the afternoon of the shooting he talked to the deceased about his wife and said, "I don't want you to be calling her any more * * * if you do, Ray, 'I'll shoot you'. * * * 'don't bother her any more, Ray'. * * * 'you better (stay away), Ray, or I'll shoot you.' " It was within the province of the jury to determine whether or not defendant's statements to Marie Sanders, in fact, referred to the deceased.

4. Prosecuting Attorney's Closing Argument, and His Questioning of Witnesses.

Defendant in his brief and argument insists that inflammatory, untrue, and unfair statements of the prosecuting attorney in his closing argument to the jury and improper conduct of the prosecuting attorney in questioning defendant and witnesses entitled defendant to a new trial. The record shows that defendant's counsel objected at only three points in the closing argument—when the prosecuting attorney said, first:

"I think this defendant did call for Dr. Horsley's services, but gentlemen, there were two telephone calls, one received by the doctor's daughter, and the other one by his wife. * * * "

second:

"It has been mentioned also that every time Dr. Whalen gets on a witness stand in one of these cases, he is going to testify that the man is sane. * * * I believe you will recall Dr. Whalen telling the percentage of these type of cases that he examined that he found were insane."

and third:

" * * * if a man can kill another man and then come into this court room in Big Horn County and testify 'I had a blackout when I fired the gun,' and then have a psychiatrist come in and say he did have a blackout, based apparently on the fact that the defendant told him he had a blackout, and then be acquitted, then

gentlemen, in that event, I guess we don't need our penitentiary down at Rawlins. We might as well do away with it."

Considering these points, we note that defense counsel do not now argue the impropriety of the reference to Dr. Whalen's testimony; and this point need not be considered. As to the reference to the two telephone calls for Dr. Horseley, it would seem that this merely constituted the prosecutor's interpretation of the evidence. If counsel disagreed with this, then it would have been within their rights during argument to the jury to interpret this as they saw it or, of they desired, to present the witnesses' exact words from the record.

" * * * Counsel should not be subjected to unreasonable restraint in commenting on the evidence, but should be allowed a wide latitude, and the scope of permissible argument is a matter for the sound discretion of the trial judge. * * * " 88 C.J.S. 360.
Defense counsel's present casual mentioning of the prosecuting attorney's reference to doing away with the penitentiary is insufficient to warrant discussion without the citation of authorities on the subject.

After the case had been submitted to the jury, defense counsel in chambers moved for a mistrial for the reason that the argument of the State was "Inflammatory, and unfair * * * the County Attorney * * * stated positively that the defendant was guilty of some definite crime * * * that the first accusation of any falsification on the part of defendant during the trial was made in the closing argument, and not in the opening argument * * *. That other matters were presented in the closing argument which were not in answer to arguments of counsel for defendant, and not proper * * *. That the * * * State's psychiatrists were better to be believed than those representing the defendant." Counsel cite as a basis for their claim of the improper

conduct of the prosecuting attorney several texts including 53 Am.Jur. 392, 406. These citations indicate the desirability of a prosecuting attorney being impartial and objective rather than partisan and vituperative; and with this view, we fully concur. Nevertheless, it is stated in 53 Am.Jur. 407:

"Since in many cases the effect of improper argument can be removed by an instruction to the jury to disregard it, the courts generally require, in order to predicate error thereon, that an objection be made at the time of the improper statement, so that an opportunity may be given the attorney making the misstatement and the court to rectify the damage. * * * "
This view has often been expressed by the court of this State and the following statement is representative:

" * * * While there may be cases where the misconduct of such prosecuting attorney is so flagrant that the court would be warranted to reverse, even in the absence of such objections, the general rule is that the failure to interpose timely objections, giving the trial court an opportunity to make a ruling and cure an error, if possible, will be treated as a waiver. * * * "
State v. Wilson, 32 Wyo. 37, 56, 228 P. 803, 809.
See also Eads v. State, 17 Wyo. 490, 101 P. 946; State v. Cantrell, 64 Wyo. 132, 186 P.2d 539.

Defendant's motion for mistrial does not constitute a timely objection to the errors presently urged on this point so as to constitute error under the philosophy of the above-cited Wyoming cases. Immediate objections would have given the trial court opportunity to rule and cure any alleged error and failure to so object must now be treated as a waiver.

The prosecuting attorney's argument, while partisan, does not, in our opinion, constitute prejudicial error, especially in the absence of proper and timely objection.

It may be well to here discuss the alleged error of the prosecuting attorney mentioning Mrs. Spears' failure to testify. In the first place, there was no objection to statements of this nature in the closing argument. Moreover, there is a serious question that under our law such reference is legally improper.

Counsel quote the applicable portions of §§ 3-2602 and 3-2605, W.C.S., 1945, as follows:

" 'The following persons shall not testify in certain respects:

1. An attorney * * * or a physician, concerning a communication made to him by his (client) patient * * *.

2. A cleryman or priest, concerning a confession * * *.

3. Husband or wife, except as provided in Section 3-2605. * * *.' "

" 'In no case shall the husband or wife be a witness against the other * * * but they may in all civil and criminal cases be witnesses for each other the same as though the marital relation did not exist.' "
and in their argument assume that these statutes establish an absolute privilege, applying the statements in Annot., 116 A.L.R. 1170, 1171, to show that no comment should be made in such a situation.

Our statutes affirmatively provide that the husband or wife may be witnesses for each other in criminal cases "the same as though the marital relation did not exist." We think, therefore, that such situations in this State are controlled by the law stated at 16 C.J. 905, 906:

"Where, by statute, the wife of defendant is a competent witness for him but not for the prosecution, it is proper for the prosecuting attorney to comment upon defendant's failure to produce her as a witness * * * ." (Followed in 23 C.J.S. 569.)

Certain instances of questioning by the prosecuting attorney are now claimed by the defense to be improper, viz.:

(1) "he interrogated Bertha M. Parker, a witness for the defendant, in the following manner: 'Is it not a fact Mr. and Mrs. Spears had been separated several times before?' She replied, 'Not to my knowledge.' The county attorney followed this up with the statement, 'Is it not a fact it could have been and you not know it?' The answer was 'No.' "

(2) "the county attorney * * * in his questioning the defendant concerning a statement purported to have been made to one Forrest (Frosty) Eastman."

(3) "In the county attorney's cross-examination of the defendant, he interrogated the defendant at length in order to obtain 'I don't know' or 'I don't remember' answers so that he would be able in his final argument to the jury to state 'You heard him say "I don't know" to almost every question I put to him as to whether or not he was insane at a given time.' "

As to number (1), the record indicates that defendant's objection was overruled because it had been interposed after the answer had been given, and there was no request that the answer be stricken. As to number (2), the court sustained defendant's objection and state in open court, "the jury will disregard any inference of the last question." As to number (3), defendant failed to object to the questions which elicited the "I don't know" answers.

5. Defendant's Commitment to the Wyoming State Hospital.

The defendant on March 4, 1954, entered a plea of "not guilty by reason of temporary insanity at the time of the alleged act," and the court on the same day entered an order that defendant be "committed to the Wyoming State Hospital for observation and examina-

tion by the staff of said Hospital and by such doctors and psychiatrists as either the State of Wyoming or the Defendant may employ * * *."

Defendant now complains that "the incarceration of a defendant who is at liberty under bond and sending him to the Wyoming State Hospital for examination is a violation of his Constitutional rights and that any evidence obtained thereby was an invasion of defendant's Constitutional rights."

In State v. Riggle, 298 P.2d 349, 76 Wyo., 1, Chief Justice Blume discussed at some length the rights of a defendant who pleads "not guilty" by reason of insanity at the time of the commission of the alleged offense; and we think this court there decided that in such a situation (a) such a defendant may properly be committed to the State hospital for examination and observation, and (b) the findings and testimony of examining doctors may properly be produced by the State and submitted as evidence in the trial of the case. On the point under consideration, it is therefore unnecessary to determine any further points except the propriety of committing for examination and observation a defendant fortunate enough to be at liberty under bond. Defendant cites no cases but urges that the court hold any commitment of such a defendant for the purpose of examination to be improper—without precedent and apparently as a matter of first impression.

Section 10-903, W.C.S., 1945, states:

"In all cases where any plea of insanity is made, the judge shall forthwith order the commitment of the defendant to The Wyoming State Hospital or other suitable institution, for observation and examination by the staff of said hospital and by such doctors and psychiatrists as either the State of Wyoming or the defendant may employ * * *."

This portion of the statute is so clear that it is scarcely susceptible of misinterpretation and no exception is listed therein. No question can well be raised on the point except as to the statute contravening a constitutional right. We think it does not.

As was said in State v. Riggle, 298 P.2d at page 364, in connection with a discussion of State v. Carroll, 52 Wyo. 29, 69 P.2d 542, "when a defendant pleads insanity, he opens up his whole life." A defendant in a criminal case is not required to plead insanity; but when he does so, by his plea, he submits himself to the examination prescribed by statute and thereby permits the results of such examination to be presented to the court. Counsel, speaking of defendants who have pleaded insanity as a defense to a crime, say: "We believe the true rule to be that where a Defendant is out on bail, that he cannot be incarcerated for the purpose of examination as was done in this case." Such a holding would be not only a nullification of the statute and a vitiation of the express intention of the legislature, but, worse, would discriminate in favor of prisoners fortunate enough to secure bail and against those unfortunate enough to be held in custody. The authorities submitted present no precedent on which such a holding might fairly be based.

6. Newly Discovered Evidence.

Defendant insists he is entitled to a new trial because of the newly discovered evidence that Dr. Joseph Whalen was in Rawlins on April 10, 1954, at the time that he testified he had examined the defendant. Defendant's view of this matter is that such a disclosure would discredit Dr. Whalen before the jury and weaken his testimony that defendant was sane. No authorities are submitted on the subject, and it is therefore desirable to analyze the testimony of Dr. Whalen with which the

"newly discovered evidence" is said to conflict. The record regarding the dates of examination discloses the following conversation:

"Q. Dr. Whalen, will you please give me the dates of the examination you personally made of the defendant? A. I can't give you the dates that I personally made them, because I saw him about three times a week but I didn't talk to him and I didn't interview him. I interviewed him approximately once each week. The last one, if I remember correctly, the last time must have been about a couple of days before he left, and he was discharged, I remember, April 12th—I believe a couple of days before he left.

"Q. You have no record of it in your notes? A. I have my examinations, but not the date of the interviews, because we simply went over the material, over and over.

"Q. Do you have a record of the last examination you made? A. I have the date that it was sent out. I don't know whether my notes are here are (sic) not. The last time was April 10th.

"Q. And when did he leave? A. April 12th."

It is true that if certain of the quoted answers of the witness, Dr. Whalen, be taken out of context they would constitute *some* basis for the conclusion which defendant's counsel make that "the last examination was made by him under date of April 10, 1954." However, it is obvious that the witness was testifying from memory and without notes or records and was giving approximate dates. The entire testimony must be considered in arriving at the evaluation of a portion thereof.

We doubt if the testimony which defendant now proposes to present, i.e., that Dr. Whalen was not in

Evanston on April 10, 1954, and was absent therefrom beginning at 10:00 A.M. on April 7, 1954, until 11:00 P.M. on April 10, 1954, is sufficiently inconsistent with the above-quoted testimony as to the dates of his examination as to permit his impeachment. Nevertheless, we pursue this point further and find that § 10-904 (a), W.C.S., 1945, provides:

"The prosecution shall prove beyond a reasonable doubt both the commission of the offense charged and the sanity of the defendant at the time of the commission of the offense; provided that the State shall be aided by the presumption that the defendant is sane until evidence to the contrary is presented; and the burden of first going forward and entering evidence of insanity shall be upon the defendant. The testimony of examining experts autharizer (sic) in this Act shall be received either on behalf of the State or the defendant, under the rules of evidence applicable to criminal cases."

The evidence on the subject of sanity of defendant at the time of the shooting is conflicting, Drs. Whalen and Tedrow testifying that he was sane, and Dr. Ruona testifying that he was then insane.

"It is well settled that a new trial will not be granted upon the ground of newly discovered evidence where it appears that such new evidence can have no other effect than to discredit the testimony of a witness at the original trial, contradict a witness's statements, or impeach a witness, unless the testimony of the witness who is sought to be impeached was so important to the issue, and the evidence impeaching the witness so strong and convincing, that a different result must necessarily follow. * * * " 39 A.J. 173, 174.

After an analysis of all of the testimony in the case, we cannot say that because of the newly discovered evidence a different result would necessarily follow, even though the credibility of Dr. Whalen were impaired by the new evidence.

### 7. Evidence of Malice.

Defendant urges that the evidence of malice was wholly insufficient to support the instructions given, the verdict rendered, and the judgment and sentence for murder in the second degree. In that connection, it is necessary to analyze the evidence in order that we may determine whether or not it showed malice; and for guidance in evaluation, we must review the previous holdings of this court to determine what malice is.

In State v. Sorrentino, 31 Wyo. 129, 139, 224 P. 420, 423, 34 A.L.R. 1477, the court said:

" * * * In its popular sense, the term malice conveys the meaning of hatred, ill will, or hostility toward another. 29 C.J. 1084. That is not its legal meaning, but the term nevertheless implies a wicked condition of mind while the homicide is committed; a mind, we may say, committing the very act willfully. * * * "

In Eagan v. State, 58 Wyo. 167, 196, 128 P.2d 215, 225, the court said:

" * * * If the facts and circumstances of the homicide appear, malice is inferred, not from the use of a deadly weapon alone, but from all the facts and circumstances so shown. * * * (Citing many cases.)"

In State v. Helton, 73 Wyo. 92, 113, 276 P.2d 434, 441, the court said:

"The next question is, does the evidence warrant a finding that the killing was done maliciously?

"It is not too difficult to find the answer, in view of what this court has previously said in Eagan v. State, 58 Wyo. 167, 128 P.2d 215, where a somewhat full discussion on the subject of malice in homicide was given * * *.

"While we find in the record no evidence of express malice, the law some times implies a legal malice in homicide, even in cases where no motive is proved. * * * "

In the present case, the defendant testified voluntarily and the jury was entitled to consider his testimony and certainly to believe the portions of it as were uncontroverted. Among other things he said that on the day of the killing he had been "target practicing"; that later that day he told Bookout "you better leave her alone * * * Ray, I'll shoot you * * * don't bother her any more, Ray * * * you better, Ray, or I'll shoot you"; that he went home and called Undersheriff Chris Lynn, asked him for a permit to carry a gun (which he was already carrying), and was advised not to carry it; that he went to the bar with his wife, still carrying the gun which he had been using in "target practicing"; that he told the bartender, in referring to Bookout, "if you see him up front there, tell him to drift back this way, I want to see him"; that he walked up front to get Bookout, took him to the booth where the defendant and his wife had been sitting, engaged him in conversation about the wife, and during the conversation, fired the fatal shot. From these statements of defendant and without corroboration from other sources, the jury might well have found defendant to have had a wicked condition of mind while the homicide was committed, i.e., that defendant at that time bore hatred, ill will, and a hostility toward the deceased.

We appreciate counsel's sincerity in the statement that the act of killing occurred because of "uncontrollable passion to dispose of one who then stood before him with a statement just off of his lips to the effect that defendant's wife had been an easy mark for him at Byron"; but such a statement undoubtedly overlooks many, if not all, of the salient acts and statements of defendant above mentioned which were part of the evidence before the jury.

The circumstances call to mind the statement of the court in State v. Riggle, 298 P.2d at page 360:

" * * * We do not think it is necessary to discuss the question of premeditation and deliberation extensively in view of the evidence which we have heretofore set out. Counsel for defendant seem to have forgotten that we are not the trier of facts. It was for the jury to weigh the evidence in the case. It is quite apparent from the state's testimony that defendant became jealous, angry, and excited close to or very shortly after 6 p.m. of the day the homicide was committed, and remained so to the time of the homicide. He had two more hours or more to deliberate and think upon whether or not he should permit his anger to go to extent of committing the homicide in question * * * "

In the present case, the defendant, according to his own testimony as above mentioned, had spurred himself on over a period of some hours, and, according to the testimony of other witnesses, over a period of days or weeks.

Whether the "uncontrollable passion" brought about the purpose to kill or the purpose to kill brought about the "uncontrollable passion" is a question of fact for the jury to resolve.

" * * * the mere fact of passion on the part of the slayer will not reduce the crime from murder to manslaughter, where he entertained a previous purpose to kill, unless it is made to appear that such purpose was abandoned before the homicidal act was committed. * * * " 26 Am.Jur. 168, 169.

See also Annot., 5 L.R.A. (N.S.) 809, 819, citing Collins v. United States, 150 U.S. 62, 14 S.Ct. 9, 37 L.Ed. 998.

These authorities hold in essence that whether a homicide is committed upon a sudden heat of passion or purposely and maliciously depends upon circum-

stances and conditions which the trier of fact is entitled to interpret. As we have pointed out, there was sufficient evidence presented in this case, if it were believed, to show that the homicide was committed purposely and maliciously.

" * * * a jury's finding on the facts, approved by the trial judge's refusal to set the verdict aside, will not be disturbed on appeal if thereis any substantial evidence to support the finding. See State v. Wenger, 47 Wyo. 401, 410, 38 P.(2d) 339. * * * " State v. Vines, 49 Wyo. 212, 237, 54 P.2d 826, 834.

We find no prejudicial error in the record. The judgment is affirmed.

Affirmed.