**Richard KIRK, Appellant (Defendant below),**

v.

**The STATE of Wyoming, Appellee (Plaintiff below).**

**No. 3423.**

Supreme Court of Wyoming.

Dec. 15, 1966.

Rehearing Denied Jan. 23, 1967.

E. J. Herschler, Kemmerer, for appellant.

Dean W. Borthwick, Deputy Atty. Gen. and Lawrence E. Johnson, Asst. Atty. Gen., Cheyenne, for appellee.

Before PARKER, C. J., and HARNSBERGER, GRAY, and McINTYRE, JJ.

Mr. Justice HARNSBERGER delivered the opinion of the court.

Upon trial by a jury of his peers, Richard Kirk was convicted of first degree murder without any qualification being added to the verdict. He was thereupon adjudged guilty of the crime and sentenced to suffer death. From that judgment and sentence Kirk has appealed contending the court committed prejudicial error at his trial by admitting as evidence two photographs, a handwritten statement made by him and a typewritten copy thereof; by limiting the cross-examination of a witness relative to prior statements; and because of the improper conduct of the county and prosecuting attorney.

From the record brought to us, it appears to be undisputed that Kirk had been arrested and taken into custody by local police officers upon a charge of breach of the peace at Stonington, Connecticut. While being so held, a woman with whom Kirk had been traveling in the State of Wyoming informed the Stonington police that he had committed a murder in Idaho. When told what the woman had said, Kirk denied it.

Kirk was then visited by a Connecticut police detective who identified himself to Kirk, showed him his badge and credentials, and informed Kirk he had been assigned to assist the Stonington police department; that he was representing the State's attorney's office, and advised Kirk he had been implicated in the shooting of a hitchhiker in or near the State of Wyoming; that he had a right to remain silent; that he did not have to make any statements; that any statements he did make could be used either for or against him in court; that he had the right to be represented by counsel; and, when Kirk said he had no funds, further advised him if he wanted the officer would call the public defender, but that Kirk indicated he did not want an attorney; that he was not interested at that time with an attorney; that Kirk was alert and responded well to questions; that Kirk was not in any way threatened, no promises were made to him, and he was not denied anything he requested; that Kirk was given cigarettes, allowed to smoke, was served a sandwich and coffee; and Kirk made no requests that were not granted. Kirk denied none of this, but himself stated he had been very well treated since he had been in custody and made no complaints about the way he had been treated.

It further appears that when Kirk asked to have the woman present, she was brought in, seated beside him, and he held her hand while he gave the statement, the admission in evidence of which is here criticized; that nothing was done to induce Kirk to talk other than to ask him to tell the truth, in which request the woman joined.

Kirk's statement was first written out by the officer in longhand, then examined,

corrected, and signed by Kirk who also initialed corrections and each page. Afterwards this longhand statement was copied in typewriting which was also signed and identified by Kirk. After the statement was taken, but before it was signed, Kirk asked whether Wyoming was a capital punishment state, and, when told that it was, Kirk signed the statement.

At the trial the woman who was still married to the father of her three-year-old daughter but was then pregnant by defendant Kirk testified she and her child had accompanied Kirk traveling by automobile across the United States; that the trip was financed in part by money and food obtained by theft and from services and money procured by use of a credit card; that while traveling one evening in Wyoming to Jackson, Wyoming, they passed a hitchhiker; that after driving past the hitchhiker they turned around, passed him again, then turned around a second time; that Kirk stopped the car, got out and obtained a P-38 police special gun and clip with bullets in it from the car trunk and told her to load it; that she couldn't put the clip in so Kirk loaded the gun; that Kirk directed her to drive the car and told her he was going to get some money and was going to kill the hitchhiker; that when they got to the hitchhiker Kirk told her to stop the car, which she did just beyond the hitchhiker; that when the hitchhiker walked up to the front of the car Kirk leveled "his arm" and pulled the trigger; that the hitchhiker fell face down; that just before the gun was fired the hitchhiker seemed to say "No"; that no sooner than Kirk pulled the trigger he was out of the car, threw the gun in her lap, told her not to move the car, put the hitchhiker's suitcase and box in the car, then told her to move the car about a car-length, get out and look under the hood like she had motor trouble; that Kirk pulled the body of deceased by the feet off into the grass, then got back into the car, and they left the scene of the shooting; that Kirk said he did not feel anything, and it did not bother him at all, that he could kill a man or

woman and it wouldn't bother him, he felt absolutely nothing, and said "The cheap bastard never even had a watch," and that he wasn't worth the price of the bullet he had just used.

After this testimony describing the killing the woman testified they returned to the scene of the murder, found the body, and Kirk removed some of its apparel saying he shined a flashlight into deceased's face and couldn't help laughing at the way he looked; that he "tickled his toes," searched the body, stripped the body, checking for a money belt; and that Kirk said he had almost cut the hitchhiker's penis off and brought it to her and remarked about its size.

The woman also testified that the night before the murder Kirk had held the same gun with which he killed the hitchhiker to her daughter's head, and almost killed the witness that night; that he had split her head open with a hammer four days before the hitchhiker's murder, and had almost strangled her and her daughter, had broken her nose the night before the murder, tried to kill her unborn child by ramming his fists into her stomach, and she was terrified and afraid of Kirk, even more so after the shooting.

Her further testimony respecting a great number of less important details was corroborated in numerous instances.

On the other hand, there was a complete absence of evidence attacking her credibility, and the statements made by Kirk at Stonington paralleled her own statement originally given the officers as well as that of her testimony given at the trial. Although Kirk testified he had seen at least a part of the woman's original statement at the time he made his own statement, that was directly and positively contradicted and repudiated by competent evidence which the jury obviously elected to believe. Medical evidence showed a hole on the left of the upper lip and an opening on the back of deceased's neck, which the medical expert said could well be a bullet hole.

The appellant's first grounds for appeal complain of the admission of two photographs as evidence. One such black and white photograph shows only a part of a body lying in tall grass, a portion of the chest and possibly a small section of the upper abdomen being bare. The other black and white photograph is about the same, although taken from a slightly different angle. These photographs were cogent evidence corroborating both the woman's and Kirk's testimony as to the disposition of the corpse. No case cited by appellant is authority for the exclusion of such evidence. This ground for appeal is without merit.

The next ground for appeal attacks the admission of Kirk's statement as evidence. The undisputed facts as hereinabove related show that every warning and all the information required by the latest decisions of the Federal Supreme Court to be given a person held in custody were positively given before he was interrogated and gave his statement, and that Kirk himself had not at any time disputed this.

Kirk himself testified that at the first he was told he was entitled to an attorney, and that when he said he did not have the money to hire one, he was told there was a public defender who would be called if Kirk wanted. Although Kirk at the trial testified he said he would like to talk to somebody to tell him what to do—advise him what to do—and that right at that moment the officer did nothing but told Kirk he would get him the attorney if Kirk wanted him; that the officer kept telling him he could have an attorney; and that Kirk kept telling the officer he wanted to talk to somebody, the officer testified that Kirk refused the offer to get him the public defender; that the authorities at Kirk's request brought in the woman; and that, when Kirk asked her what he should do, she told him to tell the truth.

Under these circumstances, the statement Kirk had given at Stonington was received in evidence. It was begun with these words, "I, Richard Wilbur Kirk, age 39, DOB 7-1-25, of Bethel, Maine, make the following true and voluntary statement without fear, threat or promise, knowing same may be used in court. I have been warned that I do not have to make any statement and that I have a right to an attorney," and was substantially a counterpart of the woman's testimony respecting the way in which the murder took place.

Immediately following the production of Papp, the witness who was to testify about defendant's confession, the court stated, "there is a matter developed that the Court will have to hear out of the presence and hearing of the jury" and excused the jury. Papp was then examined before the judge. After comprehensive cross-examination of the witness, Kirk's counsel concluded with the statement, "I have no further questions." After the trial was resumed before the jury, practically the same evidence heard by the court out of the jury's presence was produced, and the statement was received in evidence without any objection being made and without any suggestions that the statement was involuntary. Even after the statement had been read to the jury, defense counsel stated he had no questions and offered no objections, did not elect to produce any witnesses or evidence in Kirk's behalf, nor was the court ever informed during the State's case that any other witness was desired or that there was anything the defense wanted the court to consider. In fact, there was not the slightest challenge to the voluntariness of Kirk's confession, and there was no conflicting evidence. However, after the State had rested its case and the defendant had testified, giving a different story as to how he killed the hitchhiker, defense counsel objected to the receipt of Kirk's statement in evidence on the ground it was not voluntary and asked that the record show the objection to have been made at the time the statement was offered. The record does not in fact show any objection was made when the statement was offered and received in evidence, and the afterthought of counsel, even though agreed to by the prosecution, does not change the fact.

Because the Federal Supreme ·Court has enlarged so greatly the rules of law heretofore existing with respect to what is required in order to relieve statements and confessions of persons accused of crime from the charge of involuntariness, we have given its pronouncements close, careful, and thoughtful study and consideration.

Among the first of these cases is Jackson v. Denno, 378 U.S. 368, 391, 84 S.Ct. 1774, 1788, 12 L.Ed.2d 908, 1 A.L.R.3rd 1205, dealing with a situation where the trial court had indicated its awareness that defendant's counsel was questioning the circumstances under which defendant had been interrogated while under sedation. The Court there said:

"* * * The procedures used in the trial court to arrive at its conclusions on the *coercion issue* * * * must, therefore, be fully adequate to insure a reliable and clear-cut determination of the voluntariness of the confession, including the resolution of *disputed facts* upon which the voluntariness issue may depend. * * *" (Emphasis supplied.)

As heretofore noted, in the instant case immediately following ·the· production of the witness Papp, the court in an abundance of caution excused the jury and conducted a hearing out of their presence. As will be observed, there was no true occasion under the holding of the Jackson case for him to have proceeded with a separate hearing since there was not then any evidence whatever on the coercion issue or any disputed facts as to the voluntariness of the confession, on which ·elements the determination-of-voluntariness requirement of the Jackson case was based. Likewise, at this separate hearing there still developed no intimation of coercion or nonvoluntariness of the confession, nor was anything of that nature developed at any time during the presentation of the State's case. It was only after the prosecution had rested that defendant for the first time claimed that, although he had at first been given all information and warning required by federal decisions, he had

later told Papp he wanted "somebody" to tell him what to do. It follows that the Jackson case is inapplicable to the instant situation.

Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, holds the right .of an accused to counsel does not depend·on whether, at the time of interrogation, the authorities have secured a formal indictment, but that the accused may intelligently and knowingly waive his privilege against self-incrimination and the right to counsel either at a pretrial stage or at the trial.

In the case of Kirk, notwithstanding he was not yet charged or indicted for the crime of murder but was merely in custody upon a charge of breaching the peace, he was promptly informed of the source and nature of a report implicating him as a suspect concerning the death of a hitch-hiker in Idaho and, before any interrogation leading to his making the questioned statement, the officer identified himself to Kirk, warned him he had a right to remain silent, that anything he said might be used either for or against him, that he had the right to counsel and if he could not afford an attorney, he would be furnished with the services of the public defender. Under these circumstances there was a full compliance with the requirements of Escobedo, as it was shown that Kirk was alert and had understanding. So, when, following these warnings and the information given him, Kirk said he did not want an attorney, his refusal of the offer to provide him with the services of the public defender was an express waiver of his constitutional rights as defined in Escobedo.

In addition, there was a marked difference in the circumstances surrounding the taking of Escobedo's confession and those present when Kirk gave his statement.

In Escobedo the accused was arrested and while handcuffed behind his back and while standing he was questioned for four hours until he confessed. He was told, 378 U.S. at 479, 84 S.Ct. at 1759: "'they had us pretty well, up pretty tight, and we

might as well admit to this crime.'" He asked to see his lawyer, but the police said his lawyer did not want to see him. The lawyer, however, said he asked to see his client but was told he could not because they had not completed questioning him. An officer told Escobedo he and his sister, also held in custody, could go home and they would only be held as witnesses if he "pinned it on" another. He made his statement only because of that assurance. Escobedo was not advised of his constitutional rights.

In Kirk's case all the required warning and information were given and he expressly waived his rights. In addition, he admitted he was well treated, was given refreshment and cigarettes, and all his requests were granted, including his request to have his woman present. No promises were made him, he was not threatened or mistreated in any way, either physically or psychologically, and he was told, when he asked about it, that in Wyoming there was the death penalty for first degree murder. Furthermore, Kirk's statement, coupled with testimony which Kirk does not dispute, that he demonstrated he could read his statement, that he then proceeded to read it, made corrections, initialling them, and then signing the statement, irrefutably proves Kirk had been informed of his rights, and he was not acting from threat or promise.

In Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, and related cases of Vignera v. State of New York, Westover v. United States, and State of California v. Stewart, the court prefaced its opinion by saying it granted certiorari to give concrete constitutional guidelines for law enforcement agencies and courts to follow, and briefly stated its holding to be, 86 S.Ct. at 1612, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Acceptable

procedural safeguards are then said to be that, 86 S.Ct. at 1612, "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Following this explanation, the court says, 86 S.Ct. at 1612:

"* * * If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned."

The Court then proceeds to relate the circumstances surrounding the questioning. In Miranda the accused's questioning took place in a room cut off from the outside world. Miranda was not given a full and effective warning at the outset of the interrogation process. The interrogation was conducted while Miranda was being held incummunicado in a police-dominated atmosphere without full warning of constitutional rights.

The Court professed it was only implementing what was said in Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897), which set down the Fifth Amendment standard for compulsion, wherein it was stated, 86 S.Ct. at 1621:

"'* * * The rule is not that, in order to render a statement admissible, the proof must be adequate to establish that the particular communications contained in a statement were voluntarily made, but it must be sufficient to establish that the making of the statement was voluntary; that is to say, that, from the causes which the law treats as legally

sufficient to engender in the mind of the accused hope or fear in respect to the crime charged, the accused was not involuntarily impelled to make a statement when but for the improper influence he would have remained silent. * * *'"

In Kirk's case, however, he was timely given all the information and warnings required by the Federal Court. There was nothing to engender either hope or fear to induce him to make his statement. He was not questioned by anyone. He was merely advised to tell the truth. This was the limit of all that was said to him by either the officers or the woman whom he had requested be present.

So the procedural rules laid down in Miranda and its associated cases have been strictly observed in Kirk, and they were scrupulously complied with.

In any event the latest Federal Court decision, June 20, 1966, Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 1775, 16 L.Ed.2d 882, precludes Kirk from receiving any benefit under Miranda, as the Court there says, "We hold further that *Miranda* applies only to cases in which the trial began after the date of our decision one week ago [June 13, 1966]." This latest decision expressly disavows that the Federal Court has created a constitutional strait jacket or that it so intended. The court also said, 86 S.Ct. at 1780, retroactive application "would require the retrial or release of numerous prisoners found guilty by trustworthy evidence in conformity with previously announced constitutional standards." Miranda was decided June 13, 1966, and Kirk's trial was commenced on December 7, 1964, the judgment rendered and sentence imposed on December 11, 1964, both dates anteceding Miranda.

There is material difference in Maki v. State, 18 Wyo. 481, 112 P. 334, 33 L.R.A., N.S., 465, cited by appellant, from this case. There the accused was not told he need not make any statement, and he was not told that if he made a statement it might be used against him in court. By contrast, in the case now before us, the appellant was specifically told he need not answer any questions or make any statement; he was informed that he was entitled to have counsel and, if he so desired, counsel would be furnished him; and he was warned that anything he said might be used against him if he was subsequently charged with crime. Additionally, in Maki this court said, 18 Wyo. at 488, 112 P. at 336, "The great weight of authority and the trend of the later decisions is to the effect that if he [the accused] has been advised of his rights and duly cautioned and he then testifies voluntarily, his evidence is admissible against him," citing numerous authorities and followed by the court's observation that, "The object and purpose of warning the accused under such circumstances is two fold: First, that it may be brought home to his mind that what he says under oath may be used against him and being so informed, that he may be free to act as he pleases; and, second, that a legal proceeding may not be converted into an inquisition." Maki also cited Shoeffler v. State, 3 Wis. 823, where, before the defendant was arrested and only suspected of having committed the homicide for which he was subsequently tried and convicted, he made a statement under oath which was held admissible, although he had neither been cautioned nor informed of his right to decline to answer any question. Thus Shoeffler v. State, supra, referred to in Maki sustaining the admissibility of statements of an accused even though not advised of his right to refuse to answer questions, to have counsel, to be provided with counsel, and that anything he said might be used against him upon trial of the criminal charge for which he was then under arrest, goes far beyond any claim the State makes in the case now before us. The record here shows this appellant had been well advised of all his rights before making the statements.

To support the claim that the woman was improperly used to extract a confession from Kirk, appellant cites Spano v.

People of State of New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265. In Spano after the accused was indicted for murder he telephoned a police officer who was his close friend and related some circumstances pertinent to an encounter with the deceased. The following day, accompanied by his counsel, he surrendered to the authorities. His attorney cautioned Spano not to answer questions. After the accused had been unsuccessfully questioned by the police for virtually eight hours, and his request to see his attorney was denied, his police-officer friend was instructed to tell the accused his telephone call had gotten the officer in a lot of trouble and to try and "extract" sympathy from the accused for the officer's pregnant wife and three children. This first attempt of the officer to procure a confession was unsuccessful, the accused again asking to see his attorney, which request was again denied. A second unsuccessful attempt to secure a confession was made by the officer friend, and a third attempt was equally fruitless. A fourth attempt was made, and, after a full hour, the accused succumbed to his friend's prevarications and the statement was obtained.

There is no similarity in Spano and this case. No prolonged and repeated effort was made to get Kirk to confess. No deception or falsehood was indulged in. No friend of the accused played upon his sympathies by making untrue representations. It was Kirk who asked to have the woman present. It was Kirk who asked her what to do, and the only response she made was to tell him to tell the truth.

Malinski v. People of State of New York, 324 U.S. 401, 65 S.Ct. 781, 89 L.Ed. 1029, is also cited by appellant to fortify the contention of coercion. There, a convict friend was brought from the penitentiary to the hotel where Malinski was being held, and he and Malinski were put alone together. Shortly afterwards Malinski confessed. The court, however, did not hold this amounted to coercion but said that there was coercion because Malinski was held incommunicado except for this visit from his convict friend, because he was not allowed to see a lawyer, though he asked for one, and because the prosecution's comments to the jury placed beyond doubt that the confession was coerced. There is nothing of this kind present in Kirk's case.

Appellant refers to Mortimore v. State, 24 Wyo. 452, 161 P. 766, 769, as quoting § 649, Wharton's Criminal Evidence (II Wharton's Criminal Evidence, § 649, pp. 1346–1347 [10 Ed.] presently 2 Wharton's Criminal Evidence, § 390, pp. 124–125 [12 Ed.]), saying:

"'* * * even a slight inducement held out by such a person [i. e. persons in authority] renders the confession involuntary, because the accused would have reason to believe that such person is not only credible, but is in a position to carry the inducement into effect.'"

The complete inapplicability of this pronouncement lies in the fact that there is not the slightest evidence that inducement of any kind was held out to Kirk, and Kirk has not ever contended to the contrary. Equally inapplicable is the quoted excerpt from 3 Wigmore on Evidence, § 825, pp. 253, 254 (3 Ed.), asking, Was the confession induced by thought or a promise, by hope or fear, followed by the statement, "'Its admissibility is made to depend on its being free of the suspicion that it was obtained by any threat of severity or promises of favour, and of any influence, even the minutest.'" Also appellant's quotes from 23 C.J.S. Criminal Law § 825b, p. 210, and 2 Jones on Evidence, §§ 400, 401, pp. 743–746 (5 Ed.), to the same effect, do not help appellant for the same reasons stated above.

Haynes v. State of Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513, adds nothing to appellant's suggestion of coercion for the Court there based its conclusion upon the fact that the prosecution failed to contradict the accused's testimony that he wanted to call his wife, but was not permitted to do so, and that the officer told him that when he made a statement

and cooperated, and as soon as he was booked, he could call his wife. In Kirk his belated testimony that he asked to talk to "somebody" was directly and positively contradicted by competent evidence.

The next ground of the appeal is that the court limited the cross-examination of the woman as to her prior statements.

Before she testified it was made plain to her that she would be granted immunity as to any matter about which she might testify, and defense counsel also apprised her that she would be cross-examined by him, which examination when made required nearly 40 pages of transcript, and at the conclusion of which defense subjected her to approximately a page and one-half of recross-examination, and when asked if he had any more questions, he replied, "No." Later on, under stipulation with the State's counsel, the defense called the woman for cross-examination as an adverse witness, the court reminding counsel that the examination be limited as had been discussed in chambers. This further cross-examination required another seven pages of transcript, ending with defense saying, "I have no further questions."

During the cross-examination defense counsel wanted to hand the witness what he represented was her statement. When the court reminded counsel that this did not accord with the understanding which had been reached in chambers, defense counsel stated, "what I am driving at is why she should be so concerned about the truth, when in fact she hasn't told it herself." After this the cross-examination of the woman continued until defense counsel told the witness to "step down."

We are at a loss to discover from this record any merit in the defense's contention it was erroneously limited in the cross-examination of the witness.

The final ground for the appeal charges the State's attorney with improper and prejudicial conduct. This complaint is bottomed in the State's attorney having cross-examined the defendant about guns, it having appeared by other evidence that there were several guns in defendant's car when the killing took place. The defense also claims impropriety because, after defendant had testified he had been convicted of robbery, and State's counsel inquired about that conviction, and defendant had said the conviction was for unarmed robbery, State's counsel inquired if the defendant had any guns about his person, and he replied "No, Sir." Objection to the evidence was made but no ruling was made and the matter was dropped. We see nothing objectionable about the question or of impropriety on the part of the State's attorney. Further criticism is made because 'the defendant was asked, after he had testified he had not been convicted of any other felony, if he had been convicted of a different felony upon a certain date, to which defendant replied "Not to my knowledge." Again, we see no misconduct in this questioning by the State's attorney.

Although not asserted as grounds for appeal, appellant indicates there is some kind of error because the officer in Connecticut who arrested Kirk was not produced as a witness. This officer's name was endorsed upon the information, but it was not within the power of the court or of the State to require or compel his presence. The suggestion is entirely without merit.

Because the court was, under the law, required by the jury's verdict to pronounce and did, by its judgment and sentence, impose the extreme penalty, we have made the most detailed and careful study of the record and all legal questions involved in this case. From this we reach the unescapable conclusion that the convict was treated with exemplary courtesy and consideration from the moment it came to the attention of the Connecticut authorities that he might be a suspect for having committed a murder in either Idaho or Wyoming; that every request Kirk made was granted him; that the only interrogation made was to ask Kirk to tell

the truth; that he was not held incommunicado; that he was not subjected to any physical or psychological threat or influence, and, although he belatedly testified he had said he wanted to talk to "somebody," that was refuted by competent testimony, and the jury elected to disbelieve Kirk. The convict was accorded an eminently fair and just trial, and the penalty made mandatory by the jury's verdict was justified both in law and in Christian morality, for it is written, "Whoso sheddeth man's blood, by man shall his blood be shed: for in the image of God made he man." Genesis IX, 6.

There being no error in the proceedings leading to the arrest, the trial, or the verdict of the jury, the judgment and sentence pronounced by the trial court are affirmed, and this court appoints Friday, February 3, 1967, for the execution of the sentence pronounced by the court below.

Affirmed by a divided court.

Justice McINTYRE delivered the following opinion with Justice GRAY concurring therein.

We think our colleagues are misconstruing the record in this case sufficiently to make a substantial variance in the ultimate decision reached. We also think some of the impact and intended guidelines for dealing with confessions, as set forth in recent decisions of the United States Supreme Court, are being side-stepped and evaded.

Of course, we do not pretend to ignore or dispute the obvious and admitted guilt of the defendant, Richard Kirk. The manner of dealing with his confession and other errors in the trial, however, could have had an important bearing on the decision of the jury in finding for death in lieu of life imprisonment. The testimony of Kirk's accomplice, Shirley Brearley, must have played an important part in that decision.

Mrs. Brearley and Kirk were jointly charged with first-degree murder. At the trial, the prosecuting attorney granted immunity to Mrs. Brearley and announced that nothing she said would be used against her. Very little reliance, if any, ought to be placed in the testimony of the accomplice under these circumstances. The court did instruct that the jury could not convict on her testimony alone, unless it was corroborated by other credible evidence. See State v. Vines, 49 Wyo. 212, 54 P.2d 826, 834–836.

In many important respects the testimony of Mrs. Brearley was not corroborated except by the written confession of Kirk. Thus, it is apparent why the handling of this confession by the trial court was critical. It is not for our court to decide whether the confession was in fact true or not true, but it is our duty to say whether it was properly received.

In 19 Wyo. L. J. 203 (1964), Professor John O. Rames of the University of Wyoming wrote a very enlightening article on the admissibility of confessions in Wyoming. He undertook to determine whether Wyoming has an approved procedure for the handling of confessions, and if so whether it is in keeping with recent pronouncements of the United States Supreme Court. We will not quote lengthy excerpts from Professor Rames, but we acknowledge a debt to him for much of our background and reasoning pertaining to the handling of confessions in Wyoming.

Probably the only case in which our procedure for handling confessions is described in some detail is Clay v. State, 15 Wyo. 42, 86 P. 17, 19, rehearing denied 86 P. 544. In that case reference is made to a "preliminary examination" for the purpose of determining whether the incriminating statements should go to the jury. The court then said if it "clearly appears" the statements were not voluntary, they should be excluded. However, if it appears such statements were voluntary, or the "evidence is conflicting" as to whether they were in fact voluntary, then, in either event, such statements should go to the jury.

We cannot say how many trial courts have followed the procedure sanctioned in the 1906 opinion in *Clay* nor how many have not. However, the record in Kirk's trial makes it clear the presiding judge in his case did follow such procedure. During the course of the preliminary examination relative to the admissibility of the confession, when defense counsel was examining the officer who had taken Kirk's confession, the trial judge interrupted and stated: "You know you are going to have to go through all this again." Counsel was apparently familiar with the practice of that court and replied, "I know that, Sir." The judge then added, "Before the jury and in the presence of the defendant." After which he explained: "The only purpose at this time is whether or not the showing is sufficient to permit it to be heard before the jury."

With two more questions thereafter, defense counsel concluded his cross-examination of the officer. Without giving an opportunity for further witnesses the court ruled: "I think there is sufficient showing so the matter may be presented to the jury." Thus, the preliminary examination was concluded and the matter of the confession was presented to the jury, with the following instruction from the court:

"An alleged written confession purporting to have been made and signed by the defendant has been introduced in evidence before you. You are instructed that unless you believe from the evidence beyond a reasonable doubt, that the defendant made the same and that he made it freely, voluntarily and without compulsion, persuasion or promises, and was not induced by duress, threats, coercion, fear, or through any improper influence, you will then reject the same and not consider it for any purpose whatsoever."

On the preliminary hearing conducted by the trial court with respect to Kirk's confession, the prosecuting attorney took the affirmative and called detective Robert J. Papp of the Connecticut State Police Department. When Kirk's attorney cross-examined this witness and concluded such examination with the statement "I have no further questions," we think that meant what such a statement ordinarily means at the close of a particular examination. It simply meant no further questions of that witness. For our colleagues to assume Kirk did not wish to be heard or offer evidence on the voluntariness of his confession is, in our view, reading something into the record which is not there.

The trial judge had already announced his procedure and his ruling by saying the only purpose at that time was to determine whether the "showing is sufficient to permit it to be heard before the jury." Add to this the fact that neither Kirk nor his attorney indicated at any time that defendant rested or was through at the preliminary hearing—for that matter, not even the prosecution had an opportunity to rest or to indicate it had offered everything it wished at this special hearing—and the only feasible conclusion to be drawn from the record is that the trial judge interrupted the hearing and ruled, without an opportunity for further evidence from either side, that there was "sufficient showing so the matter may be presented to the jury." No doubt, as we have already indicated, procedures practiced and followed by this particular judge were well known to attorneys on both sides and were for that reason complied with.

In Edwards v. Harris, Wyo., 397 P.2d 87, 93, we quoted from 2B Barron and Holtzoff, Federal Practice and Procedure, § 1104, pp. 463–464 (1961), to the effect that only those errors are waived which might have been corrected had the proper objection or request been made. The mere fact that the trial judge held a hearing out of the presence of the jury is sufficient to show defendant was objecting to the admission of his confession and requesting that such evidence be excluded. A further objection or exception after the judge announced his ruling on defendant's request would have served no purpose.

Rule 46, W.R.C.P., specifies no formal exceptions to rulings of the court are neces-

sary. In speaking of the Federal rule on this subject, which is similar to our state rule, it is stated in 2B Barron and Holtzoff, Federal Practice and Procedure, § 1021, p. 313 (1961):

> "If the court and the other parties knew what action the losing party wished taken * * * the appellate court may consider the alleged error even though no formal objection was made or exception taken. Thus if a motion or objection of the party, for which he has stated his grounds, is overruled, * * * no further objection or exception is required. * * *"

The very nature of the hearing discloses the admission of the confession was being objected to on the ground that it had not been voluntarily given, and for us to ignore the fact that defendant was requesting its exclusion is to shut our eyes to the obvious. Moreover, the United States Supreme Court, in Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 1779–1780, 12 L.Ed.2d 908, 1 A.L.R.3rd 1205, where defense counsel did not specifically object to the admission of a confession, said the trial court was aware that counsel was questioning the circumstances under which Jackson had been interrogated. It treated the case as one where a question has been raised about the voluntariness of a confession and said it is axiomatic that a defendant is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession.

In the Jackson case, the United States Supreme Court granted certiorari in a habeas corpus action to consider the constitutionality of procedure in New York governing the admissibility of a confession alleged to be involuntary. The court held, with Justices Clark, Harlan and Stewart dissenting, and with Justice Black dissenting in part, that the New York procedure (essentially the procedure followed in Kirk's trial) violated the due process clause of the Fourteenth Amendment to the United States Constitution.

According to the New York procedure, as explained in Jackson,[1] the trial judge must make a preliminary determination regarding a confession offered and exclude it if in no circumstances could the confession be deemed voluntary. But if the evidence presents a fair question as to voluntariness, as where certain facts bearing on the issue are in dispute or where reasonable men could differ over the inferences to be drawn from undisputed facts, the judge receives the confession and leaves to the jury, under proper instructions, the ultimate determination of its voluntary character and also its truthfulness.

This, it is to be noted, is what the trial judge did at Kirk's trial. And the Kirk jury returned only a general verdict upon the ultimate question of guilt or innocence, so that it is impossible to ascertain whether the jury found the confession voluntary and relied on it or found it involuntary and supposedly ignored it. This situation was criticized in the Jackson opinion.[2]

Prior to the Jackson decision, the United States Supreme Court had upheld the constitutionality of the New York rule for confessions, in Stein v. People of State of New York, 346 U.S. 156, 73 S.Ct. 1077, 97 L.Ed. 1522, rehearing denied 346 U.S. 842, 74 S.Ct. 13, 98 L.Ed. 362. Much of the opinion in Jackson was devoted to a critical analysis of the Stein rationale. Stein was expressly overruled.[3]

From our understanding of the opinion in Jackson, we think the procedure of a trial court with respect to a purported confession cannot be approved unless the court has either followed the procedure identified in Jackson as the "orthodox rule" or the procedure identified as the "Massachusetts rule."[4]

Under the orthodox rule, the judge himself solely and finally determines the volun-

---

1. 84 S.Ct. 1781.
2. 84 S.Ct. 1782.

3. 84 S.Ct. 1788.
4. 84 S.Ct. 1781–1782.

tariness of the confession. Under the Massachusetts rule, the jury passes on voluntariness only if and after the judge has fully and independently resolved the issue against the accused and has made express findings on disputed fact questions of voluntariness. A footnote in *Jackson* indicates the Massachusetts procedure was approved as not posing hazards to the rights of a defendant.[5]

Our colleagues cite Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 1775, 16 L.Ed.2d 882, for the proposition that Kirk is precluded from receiving any benefit under Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, because the decision in *Johnson* said *Miranda* applied only to cases in which the trial began after the *Miranda* decision. We cannot, however, overlook the fact that the statement relied on from *Johnson* was qualified, at 86 S.Ct. 1779, by the explanation that the nonretroactivity of the decisions in *Escobedo* [6] and *Miranda* will not preclude persons whose trials have already been completed from invoking the same safeguards as part of an involuntariness claim. As specifically pointed out by the Supreme Court, at this point, the retroactive limitations would not have the effect of curing errors committed in disregard of constitutional rulings "already clearly foreshadowed."

We need to make it clear we are not relying upon the decisions in *Escobedo* and *Miranda*, but rather upon the decision in *Jackson*, which preceded the Kirk trial by approximately six months. Therefore, the constitutional rulings relied on by us were already "clearly foreshadowed," in *Jackson*, prior to *Escobedo* and *Miranda* and prior to Kirk's trial.

In reversing Jackson's conviction, the Supreme Court remanded his case to the Federal District Court to allow New York a

reasonable time to afford the accused either a proper hearing on the issue of voluntariness or a new trial without the confession.[7] This procedure was followed by the Court of Appeals for the Fourth Circuit in Davis v. State of North Carolina, 4 Cir., 310 F.2d 904, 908. Davis' conviction was ultimately reviewed by the United States Supreme Court in Davis v. State of North Carolina, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895. There, the Supreme Court said the review of voluntariness in cases in which trial was held prior to the decisions in *Escobedo* and *Miranda* is not limited in any manner by these decisions. 86 S.Ct. 1764. Kirk's trial was held subsequent to the *Escobedo* decision and prior to the *Miranda* decision.

It seems it should be mandatory on us, where the same trial procedure was followed as was originally followed both in Jackson's trial and in Davis' trial, either to grant a complete new trial or to do what was done on appeal in those cases. In other words, the minimum required of us, according to the dictates of the United States Supreme Court, is to remand Kirk's case for a new and proper hearing on the issue of voluntariness, or in the alternative if the prosecution prefers, for a new trial without use of the confession. This was done by the Supreme Court of Oregon in State v. Brewton, 238 Or. 590, 395 P.2d 874, 880.

It is of interest to notice, according to Professor Rames' article, that the State of New York gave Jackson a new trial, and he was again convicted of first-degree murder. Also, that New York subsequently, in People v. Huntley, 15 N.Y.2d 72, 255 N.Y.S.2d 838, 204 N.E.2d 179, 183; 46 Misc.2d 209, 259 N.Y.S.2d 369, expressly adopted the Massachusetts rule for New York. One other state (Oregon), which had previously followed the New York rule, subsequently went over to the Massachusetts rule on account of the *Jackson* decision;[8] and two other

---

5. 84 S.Ct. 1781, n. 8.

6. Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977.

7. 84 S.Ct. 1790–1791.

8. State v. Brewton, 238 Or. 590, 395 P.2d 874, 878–879.

states have subsequently discarded the New York rule and selected the orthodox rule.[9]

In 1 A.L.R.3rd 1205, there is a summary of the *Jackson* decision. In the annotation beginning at page 1251, the case is referred to as a landmark case and its effect on several state decisions is shown. The annotation indicates Arizona now follows the Massachusetts rule;[10] that while Arkansas formerly followed the New York rule, it has more recently followed a procedure satisfying the *Jackson* requirements; that New Jersey continues to follow the Massachusetts rule; that because approval of the Massachusetts rule was indicated in *Jackson*, Oregon has specifically adopted such a rule; that it is not clear whether Pennsylvania, which formerly followed the New York rule, will now adopt the orthodox rule or the Massachusetts rule; and that Tennessee which formerly followed the orthodox rule has now said, if the trial judge goes further and applies the Massachusetts rule, that would not be a denial of due process under the ruling of the United States Supreme Court in *Jackson*.

We have not pretended to discuss the question as to whether Kirk's confession was in fact voluntary or involuntary. What we have been saying is that the decision in the *Jackson* case makes it mandatory on the trial judge to fully and independently resolve the issue of voluntariness himself and make express findings in regard thereto. Only after he has done this would it be proper to submit the question to the jury, if it is submitted at all to the jury. This required procedure simply was not followed in Kirk's trial.

Without meaning to infer an opinion of our own on the voluntariness question, we think it might be helpful to point out that it is actually a closer question than our colleagues have indicated. It has not, for

example, been mentioned that Kirk was brought into the police station as Stonington, Connecticut, between 1 a. m. and 2 a. m.; that he was placed in an office and subjected to intermittent questioning by Lieutenant Main until 7 a. m. and thereafter by the chief of police. Just how long we do not know. There is no showing that Kirk was advised of his rights prior to this prolonged questioning. Papp said he found him in a cell at 10:30 a. m. and took him in for further questioning.

In his testimony, Papp admitted he may have suggested it would look better to Wyoming authorities if they could be told Kirk cooperated. He specifically indicated that it would be in the best interest of both Kirk and Mrs. Brearley to tell the truth. Kirk claims, and it was not denied, that prior to his statement the chief of police said: "If you was any kind of a man whatsoever—you say you love that woman out there, she is carrying your child, if you have any feelings whatsoever for her or that child and you are any kind of a man, you will tell me the story."

Kirk may have been mistaken about the intentions of Mrs. Brearley. Her subsequent actions against him would indicate he was. It cannot be denied, however, from his undisputed testimony, that he loved her and that he thought she loved him. The detective related how, before Kirk's statement was given, Kirk asked Mrs. Brearley several times if she loved him; that she said, "Yes, I love you. I will wait for you."; and that she sat and held his hand during the time his statement was being written out.

Further undisputed testimony indicates that while Kirk's statement was being taken, the previous written statement of Mrs. Brearley was on the desk before him. Not only would it seem from all these circumstances that there may possibly have

9. People v. Walker, 374 Mich. 331, 132 N.W.2d 87, 90–91; and State ex rel. Goodchild v. Burke, 27 Wis.2d 244, 133 N.W.2d 753, 762, certiorari denied 384 U.S. 1017, 86 S.Ct. 1941, 16 L.Ed.2d 1039.

10. Since the annotation, Arizona has re-iterated its requirement for determination of voluntariness in State v. Mileham, 100 Ariz. 402, 415 P.2d 104, 107–108.

been inducements for Kirk to "tell the truth," but there may have been inducements for him to tell it like the person he was seeking to protect had told it. Our colleagues seem to assume Kirk did "tell the truth" like his companion had told it, when they say the statements made by him at Stonington paralleled the statement originally given by Mrs. Brearley to the officers. This may very well be true, but we cannot say whether it is or not because Mrs. Brearley's written statement was not admitted in evidence.

It was claimed at Kirk's trial that Mrs. Brearley had been used as a tool to obtain Kirk's confession for the police. The confession itself tends to bear out Kirk's story that he had previously agreed with Mrs. Brearley to protect her and the unborn child of her and Kirk.

In Maki v. State, 18 Wyo. 481, 112 P. 334, 335, 33 L.R.A.,N.S., 465, this court adopted a definition of what constitutes a voluntary statement, to the effect that it must proceed from the spontaneous suggestion of the party's own mind, "free from the influence of any extraneous, disturbing cause."

The presence of a trusted woman companion, professing love for him and, in the words of the detective, engaging· in "love talk," along with her urging that he "tell the truth," impliedly as she had told it, was surely an extraneous and disturbing cause which could have had an influence on a person like Kirk.

Our colleagues seek to distinguish this case from Spano v. People of State of New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265; and from Malinski v. People of State of New York, 324 U.S. 401, 65 S.Ct. 781, 89 L.Ed. 1029. We are inclined to believe, however, that there is some similarity between those cases and Kirk's case.

In any event, we repeat that it is not our purpose to try to establish that Kirk's confession was in fact not voluntarily given, but rather that this question was not properly resolved by the trial judge, according to the standards of the *Jackson* case.

*Denial of Right to Cross-Examine*

Aside from the fact that the trial judge failed to make a proper determination with respect to the voluntariness of Kirk's confession, we are in further disagreement with our colleagues on another point having to do with constitutional rights.

Amendment VI, Constitution of the United States, guarantees the accused, in all criminal prosecutions, the right to be confronted with the witnesses against him; and Amendment XIV guarantees no state shall deprive any person of life or liberty without due process of law. We have said one of the most basic elements of due process is the right to hear and cross-examine witnesses. Holm v. State, Wyo., 404 P.2d 740, 744.

The defense in Kirk's trial had an opportunity to cross-examine Shirley Brearley, his accomplice, when she was called by the prosecution as a witness against Kirk. However, at that time detective Papp had not testified and no mention had been made of the purported confession of Kirk. It is quite understandable, as explained by defense counsel, that he did not at that time care to go into the matter of Mrs. Brearley's written statement which she had given to the police in Connecticut.

After Papp had testified and after the court had allowed Kirk's confession to go to the jury, defense counsel then sought to call Mrs. Brearley as an adverse witness for cross-examination. For some reason which is not clear to us, the trial judge apparently questioned defendant's right to do so. He should not have questioned the right because the accomplice was clearly an adverse and hostile witness. She it was who informed against Kirk in Stonington, Connecticut, and caused him to be held for the murder in question. She testified on the stand that she hated Kirk. She had been granted immunity by the State for the purpose of turning State's evidence against Kirk. Indeed, in every sense of the word this woman was the State's principal prosecuting witness, and the prosecution would have had serious difficulty in proving a

case for the death sentence without her testimony.

In any event, it appears the trial judge took the question of defendant's right to call Mrs. Brearley as an adverse witness to his chambers. The record fails to show what transpired there, but later the judge refused to let defense counsel question the witness for impeachment purposes about her own written statement, indicating it did not accord with the understanding reached in chambers.

Our colleagues, without knowing what the understanding was, seem to assume defendant stipulated not to question the witness about her own statement, or maybe they assume defendant stipulated not to impeach the credibility of the witness. In any event, we think it hardly fair to say there was a complete absence of evidence attacking the credibility of Mrs. Brearley, when the trial court denied defendant the right to impeach her by showing the difference between her testimony and her former written statement.

Surely, a waiver by stipulation of a constitutional right so vital as the right of cross-examination is not to be assumed without the record showing exactly what the stipulation was. The only thing which can logically be assumed is that, in chambers, the judge laid down certain restrictions and limitations on the cross-examination; and that during the examination, he refused to let the scope of the examination go beyond his previously imposed limitations.

It seems clear to us that if the judge did, while in chambers, impose restrictions and limitations on the cross-examination of such an important adverse witness as an accomplice turning State's evidence, then such restrictions would be erroneous and prejudicial per se.

A footnote in Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 1765, 12 L.Ed.2d 977, points out that an accused may "intelligently and knowingly" waive his privilege against self-incrimination and his right to counsel. In People v. Dorado, 62 Cal.2d 338, 42 Cal.Rptr. 169, 398 P.2d 361,

370, certiorari denied 381 U.S. 937, 946, 85 S.Ct. 1765, 14 L.Ed.2d 702, the Supreme Court of California said such waiver cannot be effected unless it is intelligently and competently given.

It follows, without the need for stating reasons, that if the constitutional right of self-incrimination and the right to counsel cannot be waived unless such waiver is intelligently and competently given, then the constitutional right of cross-examination likewise cannot be waived unless the waiver is intelligently and competently given. In Kirk's case, the record is a blank and wholly fails to show a waiver of the right of cross-examination intelligently and competently given by defendant.

*Conclusions*

Inasmuch as the trial court failed to make its own determination of the voluntariness of Kirk's confession, according to the guidelines laid down in Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908, 1 A.L.R.3rd 1205; and inasmuch as defense counsel was denied the right to cross-examine the accomplice in this case on a matter which was proper for cross-examination, it is our opinion the case ought to be reversed and remanded for new trial.

## ON APPLICATION FOR RE-HEARING.

Before HARNSBERGER, C. J., and GRAY, McINTYRE, and PARKER, JJ.

Mr. Chief Justice HARNSBERGER delivered the opinion of the court.

Appellant alleges in his application for rehearing and in his brief in support thereof, that this court has failed to give sufficient consideration to (a) the alleged improper procedure used by the trial court in determining the voluntariness of written confessions of appellant, defendant below, that were introduced in evidence, and (b) the trial court's limitation of the defendant in his cross-examination of State's witness Shirley Brearley. Both points on which the application for rehearing purports to be based were given careful and

exhaustive consideration prior to the time of the writing of the opinion and the viewpoint of the court was carefully expressed regarding such matters, as well as all others raised in the original brief and argument. As to the first point, we note the present. contention of the appellant that there was sufficient evidence presented at the preliminary examination before the judge to cast a reasonable doubt on the voluntariness of the confession. The application makes no reference to any part of the record supporting such contention, and we find an entire lack of evidence on which his thesis could be based. Moreover, there was no objection by the defendant at that point. It would be strange indeed if a trial court should be bound to foresee and protect against all the possible objections which a defendant could devise in retrospect. Also, the record sufficiently showed the court did determine Kirk's confession was voluntary.

Nothing being presented in the application for rehearing which had not previously received the attention of the court, and no cause being shown for granting a rehearing, it must be denied, and this court appoints Monday, April 3, 1967, for the execution of the sentence pronounced by the court below.

Mr. Justice Parker concurs with the opinion.

Mr. Justice Gray and Mr. Justice McIntyre, while concurring with the denial of any rehearing, inasmuch as the points in question were carefully and exhaustively considered and discussed in the opinions heretofore filed, dissent from the views in the opinion which relate to the initial disposition of the cause.

Rehearing denied.

Mr. Justice McINTYRE, with Mr. Justice GRAY concurring, made the following clarifying statement:

We continue to be in disagreement with our colleagues, Mr. Chief Justice HARNSBERGER and Mr. Justice PARKER, in their statement that the record sufficiently showed the court did determine Kirk's confession was voluntary. We think otherwise.

Also, we think it would be more correct to say the viewpoint of the respective justices have been carefully expressed rather than to say the viewpoint of the court was expressed. There was at the time of our original decision and still is at this time no majority opinion of the court.